**STATE of Alaska, Appellant,**

v.

**PUBLIC SAFETY EMPLOYEES ASSOCIATION, Appellee.**

No. S–13782.

Supreme Court of Alaska.

July 29, 2011.

---

**18.** *Friedman v. Connecticut Bar Examining Comm.*, 77 Conn.App. 526, 824 A.2d 866, 877 (2003).

**19.** *Id.*

**20.** Op. at 143 n. 18.

Brenda B. Page, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellant.

Stephen F. Sorensen, Simpson, Tillinghast, & Sorensen, P.C., Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, and WINFREE, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

An Alaska state trooper was terminated partly for dishonesty. The Public Safety Employees Association (PSEA) filed a grievance on behalf of the discharged trooper and then invoked arbitration. The arbitrator reinstated the trooper, ruling that the State did not have "just cause" to terminate the trooper. The superior court upheld the arbitrator's decision. The State now appeals, arguing that the arbitrator committed gross error, and that the arbitrator's reinstatement of the trooper is unenforceable as a violation of public policy. We take this opportunity to recognize the existence of a public policy exception to the enforcement of arbitration awards. But we hold that the arbitrator's

award in the present case is not unenforceable as a violation of public policy. Because the arbitrator's award is neither unenforceable nor grossly erroneous, we affirm the superior court and uphold the arbitration decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

The State of Alaska first employed the Alaska state trooper (the Trooper) in this case in August 2003.[1] After attending the police training academy in Sitka, the Trooper was assigned to Palmer, a training post. The arbitrator found considerable evidence that Palmer is understaffed and that new troopers often work there without sufficient supervision or guidance.

In July 2005, the Trooper attended a motorcycle certification program out of state. The Trooper requested to attend the course, and a superior supported his request because of the Trooper's "personal experience operating motorcycles." Upon arrival at the program, the Trooper was informed of a rule against "horseplay" such as performing "burnouts" with a motorcycle.[2] It was later discovered that a student had performed a burnout with one of the motorcycles.

At first when the Trooper was asked individually and during a group meeting if he knew who performed the burnout, he denied any involvement. But eventually he admitted that he was responsible. The letter of termination states that the Trooper's dishonesty placed the Alaska State Troopers in a bad light and subjected other class members to questioning. The arbitrator's decision notes that the Trooper testified that the burnout was inadvertent, but admitted the allegations against him were correct. The Trooper explained that his initial silence was the result of being scared, and that it took him a while to realize he had to confess.

After the Trooper was removed from the motorcycle program, he returned to Alaska. Despite knowing of the Trooper's dishonesty, the State returned the Trooper to work and kept him involved in the processing of cases for several months. In November 2005, the Trooper received an evaluation that rated him at acceptable levels for the evaluation year ending on August 15, 2005, and recommended a merit increase. The arbitrator reported that the Trooper was initially told that his misconduct at the training would not result in anything more than a minor suspension.

During the months after the training incident, several complaints of misconduct were made against the Trooper. PSEA argued to the arbitrator that after the Trooper returned from the training class, the State engaged in a deliberate effort to discredit him. The complaints included that the Trooper erased a citizen's videotape containing evidence, spoke to the citizen in an unprofessional manner, then denied to a superior that he spoke to the citizen unprofessionally, until being confronted with a recording of his words; refused to investigate a burglary promptly, then "neither confirm[ed] nor den[ied]" to a superior that he told the victim the investigation would be "on my time, not yours"; concluded too quickly that a reported assault was without merit; failed to properly investigate alleged vandalism at a school bus yard; and failed to properly investigate or explain another alleged assault.

In December 2005, the Deputy Director of the troopers discussed the complaints of misconduct with the Trooper and PSEA. In January 2006, the Deputy Director terminated the Trooper and issued a letter of termi-

---

**1.** Because "we give great deference to an arbitrator's decision, including findings of ... fact," *State v. Pub. Safety Emps. Ass'n*, 235 P.3d 197, 201 (Alaska 2010) [hereinafter *PSEA 2010*], the following account relies heavily on the Decision and Award of Arbitrator Thomas Angelo. We also defer to the practice of the parties in not using the Trooper's proper name.

**2.** In colloquial usage, a "burnout" is "the act of burning the rear tyre caused by the wheel spinning quickly with the motorcycle stationary." MOTORCYCLE DIRECTORY, available at http://www.motorcycledirectory.co.uk/dictionary/burnout.html. Common in racing, the maneuver is used before the race "to heat the rubber to produce better traction during the race." BILL HOLDER, MOTORCYCLE RACING 75 (Brompton Books 1994). It can "produce towers of thick, white smoke." *Id.*

nation explaining his action. The letter referred to several written corrective actions that occurred before the training incident and two that occurred after it. But the letter focused above all on the Trooper's "dishonesty," especially the Trooper's "pattern of clear and deliberate deceptive conduct" at the training program. The Deputy Director found that a "thread" of dishonesty "ran through each of the issues discussed at the December 2005 meeting."

### B. Proceedings

Following the Trooper's termination, PSEA filed a grievance on behalf of the Trooper, as provided for under the Collective Bargaining Agreement between PSEA and the State. After the grievance was denied, PSEA invoked arbitration. By stipulation of the parties, the arbitrator addressed the following issues: "Was there just cause under the collective bargaining agreement to terminate [the Trooper]? If not, what is the remedy?"

The arbitrator, unlike the Deputy Director, explicitly rejected that "a pattern of dishonesty had been established." "There is no pattern of dishonesty shown by the other incidents," the arbitrator concluded, holding that the State lacked just cause to terminate the Trooper:

> This type of record presents considerable problems for an arbitrator, and especially where the misconduct alleged is typically viewed as warranting termination. If the State's history demonstrated it had substantially restricted the [Trooper]'s work assignments or if it had not created a history of lenient behavior toward similarly situated employees, its action would be sustained. As that is not the case, the burden is on the State to show why, in this case, more serious discipline was warranted. This is because the doctrine of disparate treatment is a well-accepted aspect of the just cause doctrine....
>
> I do not find that the State met its responsive burden.
>
> . . . .

> ... [A]s I cannot discern any apparent reason for the State to treat [the Trooper] differently than other even more experienced troopers, I must conclude that discharge was too harsh when measured by the disparate treatment doctrine. (Footnote omitted.)

On April 23, 2008, the State filed a complaint to vacate the arbitrator's award with the superior court. After PSEA filed an answer and counterclaim, and the State filed its reply, the parties held a status conference at which they "agreed that the matter would be resolved through briefing and argument." Superior Court Judge Craig Stowers ordered the parties to prepare summary judgment motions. On December 1, 2009, after reviewing the parties' arguments, the superior court denied the State's Motion for Summary Judgment and upheld the arbitrator's decision.

The superior court held there to be "an identifiable public policy in Alaska not to reinstate a dishonest trooper," but noted that "further questions have to be answered. What degree of dishonesty is sufficient? And does the State waive its public policy stance when it keeps the trooper on active duty, subsequently rates the trooper's performance as acceptable, and gives him a merit increase?" The superior court noted that the Trooper's "single incidence of dishonesty is relatively minor," and concluded:

> This Court does not find the arbitrator's decision to have been gross error under the facts and circumstances of this case. The Court specifically expresses its understanding that, but for the State's actions in allowing the Trooper to remain on active duty, and giving the positive performance evaluation and merit increase, this outcome would be very different.

The State now appeals. Both of the issues presented by the State for review solely concern the Trooper's intentional dishonesty at the training program.

### III. STANDARD OF REVIEW

██ The standard of review in the present case is the one we articulated in *PSEA 2010*[3]:

---

**3.** 235 P.3d 197.

We review de novo the superior court's decision to confirm the arbitration award.[2] "Both the common law and Alaska statutes evince a strong public policy in favor of arbitration. In order to encourage parties to pursue arbitration, Alaska courts have a policy of minimizing their interference with arbitration decisions."[3] Thus, we give great deference to an arbitrator's decision, including findings of both fact and law.[4] We will only vacate an arbitration award arising out of a collective bargaining agreement where it is the result of gross error—those mistakes that are both obvious and significant.[5] We will not vacate such an award merely because we would reach a different decision ourselves.[4]

---

[2] *State v. Alaska Pub. Emps. Ass'n*, 199 P.3d 1161, 1162 (Alaska 2008) (citing *Baseden v. State*, 174 P.3d 233, 237 (Alaska 2008)).

[3] *Baseden*, 174 P.3d at 237 (internal citations and quotation marks omitted).

[4] *See Alaska State Emps. Ass'n/AFSCME Local 52 v. State*, 74 P.3d 881, 882–83 (Alaska 2003); *Butler v. Dunlap*, 931 P.2d 1036, 1038 (Alaska 1997).

[5] *Alaska Pub. Emps. Ass'n*, 199 P.3d at 1162–63 & n. 10; *Baseden*, 174 P.3d at 238. The standards for vacating an arbitration award set forth in Alaska's Arbitration Act, AS 09.43.120, "do not apply to a labor-management contract unless they are incorporated into the contract by reference." AS 09.43.010; *see also Dep't of Pub. Safety v. Pub. Safety Emps. Ass'n*, 732 P.2d 1090, 1093 n. 5 (Alaska 1987).

## IV. DISCUSSION

### A. The Arbitrator's Award Is Not Unenforceable As A Violation Of Public Policy.

The State's primary argument on appeal is that "the public-policy exception to the usual deference given to arbitration decisions should be applied in this case." Because "[t]he public's interest in maintaining honesty in Alaska's law enforcement officers is paramount," it would violate public policy to enforce the "reinstatement of a Trooper ... [who] intentionally lied multiple times in an attempt to cover up his own misconduct."

---

**4.** *Id.* at 201 (citing *Pub. Safety Emps. Ass'n*, 732 P.2d at 1093).

**5.** *Alaska Pub. Emps. Ass'n v. State, Dep't of Envtl. Conservation*, 929 P.2d 662, 667 (Alaska 1996).

PSEA argues, in response, that "the public policy exception ... should be narrowly construed," and that we should be concerned only "with the lawfulness of enforcing the award." In this case, PSEA argues, the State has failed to bear its "burden of proving that illegality or conflict with public policy is clearly demonstrated."

Neither the State nor PSEA disputes any of the arbitrator's factual findings. The arbitrator found with regard to the motorcycle training that the Trooper

> was asked individually and during a group meeting if he was aware of the person who did the burnout. The [Trooper] repeatedly denied involvement but eventually admitted to his Sergeant that he was responsible.... The [Department's] termination letter asserts that the [Trooper's] failure to be truthful placed the State in a bad light and subjected other class members to questioning. The [Trooper] testified the burnout was inadvertent and admitted these allegations are correct. He explained that his initial silence was the result of being scared and it took him a while to realize he had to confess to his wrongdoing.

The parties agreed that the Trooper "engaged in dishonest behavior when he failed to timely acknowledge that he was responsible for mishandling a training motorcycle." The arbitrator agreed, but noted that the Trooper showed "no pattern of dishonesty" outside of the training incident.

### 1. The public policy exception to the enforcement of arbitration awards

We have not previously recognized the existence of a public policy exception to the enforcement of arbitration awards. In 1996, the State argued that an arbitrator's reinstatement of a demoted public employee was unenforceable as a violation of public policy.[5] But we disposed of the case on other grounds and did not address the State's argument.[6] In 2003, we vacated an arbitrator's reinstate-

---

**6.** *Id.*

ment of a terminated public employee, where the employee worked in a position of "public trust" and was convicted of felony theft of public money.[7] But we based our decision on the arbitrator having committed gross error in her application of her chosen standard of "just cause,"[8] not on the reinstatement being unenforceable as against public policy.

More recently, in *PSEA 2010*, the State advocated the "adoption of a judicially created exception to enforcing arbitration decisions where doing so would violate an 'explicit, well defined, and dominant' public policy."[9] We noted in dicta that the State's argument was "compelling," but refrained from reaching the issue because the State did not raise it before the arbitrator or the superior court.[10] In the present case, the State properly raised the issue of the public policy exception in its complaint to vacate the arbitrator's award and in its opening brief on appeal. The present case thus offers an appropriate occasion to adjudicate the issue left unreached in *PSEA 2010*.

### a. The U.S. Supreme Court's articulation of the public policy exception to arbitration awards

■ The U.S. Supreme Court first recognized the applicability of the public policy exception to the enforcement of arbitration awards in *W.R. Grace & Co. v. Local Union 759*.[11] In that case, the Court imported the public policy exception from general contract law. "As with any contract," the Court stated, "a court may not enforce a collective bargaining agreement that is contrary to public policy."[12] If the enforcement of an arbitrator's interpretation of a contract "violates some explicit public policy, we are obliged to refrain from enforcing it."[13] "Such a public policy, however, must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'"[14]

The U.S. Supreme Court reaffirmed this approach in a 2000 decision upholding an arbitrator's reinstatement of an employee who failed a drug test.[15] Quoting from *W.R. Grace & Co.*, the Court concluded: "We cannot find in . . . any . . . law or legal precedent an 'explicit,' 'well defined,' 'dominant' public policy to which the arbitrator's decision 'runs contrary.'"[16] The Court also clarified that "[i]n considering this claim, we must assume that the collective-bargaining agreement itself calls for [the employee's] reinstatement,"[17] "because both employer and union have granted to the arbitrator the authority to interpret the meaning of their contract's language. . . . They have 'bargained for' the

---

7. *Alaska State Emps. Ass'n/AFSCME Local 52*, 74 P.3d at 882, 883–86.

8. *Id.* at 885.

9. 235 P.3d at 203 (quoting *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62–63, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (declining to vacate under public policy exception an arbitration decision reinstating a truck driver who twice tested positive for marijuana)).

10. *Id.*

11. 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *see also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 33–34, 44–45, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (upholding arbitrator's reinstatement of employee discharged for alleged possession of marijuana on company property). *Misco* notes that the general doctrine that courts may refuse to enforce contracts that violate public policy

derives from the basic notion that no court will lend its aid to one who founds a cause of

action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements.

*Id.* at 42, 108 S.Ct. 364.

12. *W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. 2177.

13. *Id.*

14. *Id.* (quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)).

15. *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000).

16. *Id.* at 67, 121 S.Ct. 462 (quoting *W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. 2177).

17. *Id.* at 61, 121 S.Ct. 462.

'arbitrator's construction' of their agreement." [18]

#### b. Other state courts' application of the public policy exception in analogous labor arbitration cases

Other state courts have followed the U.S. Supreme Court in adopting a public policy exception to the enforcement of arbitrators' reinstatements of employees discharged for misconduct. In fact, "[i]t has become increasingly common for parties seeking to vacate arbitration awards to argue that the award should be vacated on the grounds that enforcement of the award would violate public policy. This trend has been most pronounced in labor arbitrations, particularly when employers challenge awards reinstating discharged employees." [19] "Not surprisingly, awards reinstating law enforcement personnel are often challenged on public policy grounds." [20]

In its briefing before the superior court, the State pointed to a Washington Court of Appeals case in which the court vacated an arbitrator's reinstatement of a Sheriff's Deputy who was terminated based on 29 instances of misconduct, including "lack of candor." [21] The Washington Court of Appeals concluded that the Deputy's "proven record of dishonesty prevents him from useful service as a law enforcement officer. To require his reinstatement to a position of great public trust in which he cannot possibly serve violates public policy." [22]

But by the time the State filed its brief before this court, the Supreme Court of Washington had reversed the court of appeals's decision, holding that "[e]ven if we were to agree that the arbitrator's decision was not good public policy and thought [the Deputy's] reinstatement distasteful, the County has failed to cite any explicit, well defined, and dominant public policy that requires vacating this award." [23]

The other cases cited by the State as persuasive authority for vacating the reinstatement of a dishonest police officer involved substantially more egregious misconduct than the dishonesty alleged in the present case. In *City of Boston v. Boston Police Patrolmen's Ass'n,* the Massachusetts Supreme Court vacated the reinstatement of a police officer who insulted the occupants of a double-parked car, arrested two of them for disorderly conduct, handcuffed one to a wall and threatened him with violence, needed to be physically restrained by a sergeant, filed a "knowingly untrue" incident report alleging assault by the occupants of the car, then "carried forward his deliberately distorted version of the event" during the department's two-year internal investigation.[24] To have "falsely arrested two individuals on misdemeanor and felony charges, lied in sworn testimony and over a period of two years about his official conduct, and

---

18. *Id.* at 61–62, 121 S.Ct. 462. As the Court has long recognized, "[t]he general rule is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 356, 51 S.Ct. 476, 75 L.Ed. 1112 (1931). The Court also noted:
   The meaning of the phrase "public policy" is vague and variable; courts have not defined it, and there is no fixed rule by which to determine what contracts are repugnant to it. The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests.
   *Id.* at 356–57, 51 S.Ct. 476. "Primarily it is for the lawmakers to determine the public policy of the state." *Id.* at 357, 51 S.Ct. 476.

19. Tracy Bateman Farrell, Annotation, *Vacating on Public Policy Grounds Arbitration Awards Reinstating Discharged Employees—State Cases,* 112 A.L.R.5TH 263 (2003) (collecting and analyzing "state cases in which it has been argued that an arbitration award reinstating a discharged employee should have been vacated on public policy grounds").

20. *Id.*

21. *Kitsap Cnty. Deputy Sheriff's Guild v. Kitsap Cnty.,* 140 Wash.App. 516, 165 P.3d 1266, 1267–68 (2007), *rev'd,* 167 Wash.2d 428, 219 P.3d 675, 679–80 (2009) (adopting "the narrow public policy exception to enforcing arbitration decisions").

22. *Id.* at 1271.

23. 219 P.3d at 680.

24. 824 N.E.2d 855, 857–59 (Mass.2005).

knowingly and intentionally squandered the resources of the criminal justice system on false pretexts," [25] is misconduct of a different order of magnitude than the Trooper's dishonesty in the present case.

Similarly, in *Town of Bloomfield v. United Electrical Radio & Machine Workers of America/Connecticut Independent Police Union Local No. 14*, which was later reversed on other grounds, a superior court in Connecticut vacated the reinstatement of a police officer where "the arbitrators found [the officer] was untruthful in the statements he made during the course of his internal affairs interviews." [26] According to the arbitrators, the officer "conducted a seriously flawed investigation and attempted to cover up his incompetence by fabricating the testimony of key witnesses." [27] "The panel also found that [the officer] had not only been untruthful during the internal affairs investigation and disciplinary proceedings, but he was also untruthful in his testimony before the arbitration panel." [28] Again, this is dishonesty on a significantly different scale than the dishonesty of the Trooper in the present case.[29]

In a more closely analogous case, a Florida District Court of Appeal upheld the arbitrator's reinstatement of the dishonest police officer. *City of Tallahassee v. Big Bend Police Benevolent Ass'n* involved a police lieutenant who "lied to his chief regarding the existence of a romantic relationship with another police officer." [30] The court found "without merit appellant's argument that the arbitrator's decision to reinstate a police officer ... constitutes a violation of Florida public policy that police officers have good moral character." [31]

In any case, comparisons to other jurisdictions can only go so far. "American courts differ in their application of the public policy exception," [32] and the preceding cases rely on analyses of state law to determine the existence and nature of a public policy. What is at issue in the present case is the public policy of the State of Alaska. We turn now to an analysis of that policy.

### 2. The reinstatement of the Trooper in this case is not unenforceable as a violation of Alaska public policy.

■ Following a path taken by the U.S. Supreme Court and many other state jurisdictions, we now endorse the State's longstanding suggestion and adopt the "exception to enforcing arbitration decisions where doing so would violate an 'explicit, well defined, and dominant' public policy." [33]

We note at the outset that the exception is consistent with the rules that we have previously adopted for determining the unenforce-

**25.** *Id.* at 861.

**26.** 50 Conn.Supp. 180, 916 A.2d 882, 883, 887 (2006), *rev'd*, 285 Conn. 278, 939 A.2d 561 (2008).

**27.** *Id.* at 884 (internal quotation marks omitted).

**28.** *Id.*

**29.** In its reply brief, the State cites two similarly distinguishable cases: *Town of S. Windsor v. S. Windsor Police Union*, 41 Conn.App. 649, 677 A.2d 464, 466–67 (1996) (vacating arbitrator's reinstatement of police officer who on three occasions revealed identity of informant to woman he believed to be drug dealer), and *City of Bridgeport v. Bridgeport Police Dep't Emps. Local 1159*, 1994 WL 198091, at *7–11 (Conn.Super.Ct., May 16, 1994) (vacating reinstatement of officer who stole items from store he was assigned to protect and then lied about doing so during official investigation).

**30.** 710 So.2d 214, 215 (Fla.Dist.App.1998); *see also Dep't of Cent. Mgmt. Servs. v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 222 Ill.App.3d 678, 165 Ill.Dec. 138, 584 N.E.2d 317, 318, 323 (1991) (upholding arbitrator's reinstatement of parole officer who made false statements to Department of Housing and Urban Development, because reinstatement was not unenforceable as violation of Illinois public policy).

**31.** *Big Bend Police*, 710 So.2d at 215.

**32.** *City of Richmond v. Serv. Emps. Int'l Union, Local 1021*, 189 Cal.App.4th 663, 118 Cal. Rptr.3d 315, 323 (2010) ("'[C]ase law on [the] public policy exception to arbitral finality 'is not just unsettled, but also is conflicting and indicates further evolution in the courts[.]' '" (quoting 2 Jay E. Grenig, Alternative Dispute Resolution § 24:19 (3d ed. 2005))).

**33.** *PSEA 2010*, 235 P.3d 197, 203 (Alaska 2010) (quoting *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62–63, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000)).

ability of contracts in general. In a 2006 decision holding that a settlement agreement was unenforceable on grounds of public policy because it violated a statutory prohibition, we reaffirmed our earlier analysis of the general public policy exception in *Pavone v. Pavone*.[34] There, we adopted the Restatement (Second) of Contracts, section 178,[35] which states:

A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.[36]

The Restatement goes on to list various factors that weigh in favor of and against the enforcement of a term.[37] Though *Pavone* dealt with a legislative prohibition on the enforcement of a promise, it quoted the Restatement's recognition that

[o]nly infrequently does legislation, on grounds of public policy, provide that a term is unenforceable. When a court reaches that conclusion, it usually does so on the basis of a public policy derived either from its own perception of the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability.[38]

Our decision today is consonant with the general guidance offered in *Pavone*. "A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy."[39] The Restatement itself contains both general guidelines for determining unenforceability on public policy grounds [40] and more specific guidelines for making this determination in various commonly recurring contexts, such as promises involving restraint of trade, impairment of family relations, or commission of a tort.[41] The specific rules distill from the general

---

34. *Jimerson v. Tetlin Native Corp.*, 144 P.3d 470, 472 (Alaska 2006) (citing *Pavone v. Pavone*, 860 P.2d 1228, 1231 (Alaska 1993)). Our first analysis of the potential unenforceability of terms in a contract that violate public policy appeared in *Inman v. Clyde Hall Drilling Co.*, 369 P.2d 498 (Alaska 1962), which states:

[W]e start with the basic tenet that competent parties are free to make contracts and that they should be bound by their agreements. In the absence of a constitutional provision or statute which makes certain contracts illegal or unenforceable, we believe it is the function of the judiciary to allow men to manage their own affairs in their own way. As a matter of judicial policy the court should maintain and enforce contracts, rather than enable parties to escape from the obligations they have chosen to incur.

*Id.* at 500 (citation omitted).

35. *Pavone*, 860 P.2d at 1231; *see also McKnight v. Rice, Hoppner, Brown & Brunner*, 678 P.2d 1330, 1334 (Alaska 1984) ("To determine whether an agreement is inoperative on grounds of public policy requires that a balance be struck between the public policy interest against enforcement and interests favoring enforcement." (citing Restatement (Second) of Contracts § 178 (1981))).

36. Restatement (Second) of Contracts § 178(1) (1981).

37. *Id.* § 178(2)-(3).

38. *Pavone*, 860 P.2d at 1232 (quoting Restatement (Second) of Contracts § 178 cmt. b (1981)). This comment to the Restatement continues:

In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is so trivial as that it plainly does not preclude enforcement. In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms.... Enforcement will be denied only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term.

Restatement (Second) of Contracts § 178 cmt. b (1981).

39. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 42, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

40. Restatement (Second) of Contracts §§ 178–85 (1981).

41. *Id.* §§ 186–99.

ones the features that have shown themselves to be most relevant in a specific context.

Similarly, reviewing arbitration awards by determining whether there is an "explicit, well-defined, and dominant" public policy against enforcement reflects how the general Restatement rules operate in the recurring context of arbitration awards. By establishing a high hurdle for the vacatur of arbitration awards, the test incorporates into its structure the "special public interest in the enforcement" [42] of arbitration decisions that will be present in every case of arbitration review, given our longstanding recognition of Alaska's "strong public policy in favor of arbitration." [43]

Having adopted the "explicit, well-defined, and dominant" public policy exception to the enforcement of arbitration awards, we now turn to the analysis of Alaska law in order to discern the relevant public policies in the present case. We have previously stated that we will "look to the entire body of law in the State of Alaska for evidence . . . to determine . . . public policy." [44] Following *Pavone*, we begin by asking whether there is "legislation specifically prohibiting enforcement of the promise or contractual term." [45] The State offers no argument in its briefing that there exists a law specifically prohibiting the reinstatement of a dishonest police officer. Instead, the State cites the following four categories of Alaska law as support for its contention that there is an explicit, well-defined, and dominant public policy in Alaska against enforcing the arbitrator's award.

(i) *Alaska's Constitution:* Without further argument, the State cites the general and abstract language from the Alaska Constitution providing "equal rights, opportunities and protection under the law," guaranteeing due process of law, and protecting the rights of crime victims.[46] Later, the State suggests that these constitutional guarantees are "premised on a criminal justice system that affords honesty and integrity to the public it serves."

(ii) *Precedent:* The State then cites our decision in *Jones v. Jennings,* where we referred to the importance of "fostering the public's trust in those charged with enforcing the law" and the need to ensure "that police behavior conforms to the code of conduct required of a democratic society." [47] But that case involved allegations that the conduct of police officers constituted assault and battery and false imprisonment, not dishonesty.[48] The State also cites an even less directly related case in which we emphasized the importance of punishing attorneys who misappropriate client funds, in order to maintain the public's confidence in the justice system.[49]

(iii) *Statutes and Regulations:* The State quotes from statutory provisions granting the Alaska Police Standards Council the power to set minimum standards for employment as a police officer,[50] including "moral character" standards.[51] "A person may not be appointed as a police officer" unless he or she meets meet these standards.[52] According to the regulations in effect in 2005, "good moral character" is defined as "the absence of acts or conduct that would cause a reasonable

42. *Id.* § 178(2).

43. *Baseden v. State,* 174 P.3d 233, 237 (Alaska 2008) (quoting *Univ. of Alaska v. Modern Constr., Inc.,* 522 P.2d 1132, 1138 (Alaska 1974)) (internal quotation marks omitted).

44. *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 P.2d 1123, 1132 (Alaska 1989).

45. *Pavone v. Pavone,* 860 P.2d 1228, 1231 (Alaska 1993).

46. Alaska Const. art. I, §§ 1, 7, 24.

47. 788 P.2d 732, 738–39 (Alaska 1990) (internal quotation marks omitted).

48. *Id.* at 733.

49. *In re Buckalew,* 731 P.2d 48, 55 (Alaska 1987). The State also cites a 1984 decision from a Connecticut superior court. But out-of-state decisions carry little weight in determining the public policies of Alaska.

50. AS 18.65.220.

51. AS 18.65.240(a).

52. *Id.*

person to have substantial doubts about an individual's honesty, fairness, and respect for the rights of others and for the laws of the state and the nation." [53]  A police officer must also "attest and subscribe to the law enforcement Code of Ethics," which includes the pledge to be "[h]onest in thought and deed in both my personal and official life." [54] By regulation, the Alaska Police Standards Council "shall revoke a . . . certificate upon a finding that the holder of the certificate" "has been discharged or resigned under threat of discharge, for cause relating to dishonesty or misconduct, from employment as a police officer in this state or any other state or territory." [55]

The latter regulation strongly suggests that it is the policy of the State of Alaska not to employ dishonest police officers.  But it is unclear whether the regulation means to prohibit the employment of police officers who have been dishonest to any degree or under any circumstance.

(iv) *Internal Regulations:*  Finally, the State notes that the Department of Public Safety's Operating Procedures Manual requires that "[e]mployees responding to superiors or to questions posed during official investigations shall truthfully answer all questions specifically directed and narrowly related to the scope of employment and operations of the Department that may be asked of them." [56]  But the Manual says nothing about the kind of informal investigation during which the Trooper lied, and in general stops short of discussing the consequences of dishonesty.

■  All of the preceding sources support the conclusion that it is Alaska's policy to maintain an honest police force.  But there has never been a question that it is against public policy for a police officer to lie.  The question is whether it is against Alaska's public policy to reinstate a police officer who has lied as the Trooper did in the present case.  None of the sources cited by the State clearly sets out a public policy as to the consequences that must follow when a law enforcement officer commits a relatively minor act of dishonesty.  Alaska Statute 18.65.240(c) states that the Alaska Police Standards Council "*may* . . . revoke the certificate of a police officer who does not meet the standards adopted under (a)(2) of this section," (emphasis added) including the moral character standard.  The use of "may" instead of "shall," along with the State's past instances of lenience toward police officers who were dishonest, discussed below, suggests that there is no categorical requirement in Alaska public policy for the termination of officers who engage in relatively minor forms of dishonesty, and thus that the reinstatement of such an officer is not in all cases a violation of public policy.

■  In light of our adoption of the "explicit, well-defined, and dominant" public policy exception to the enforcement of arbitration awards, we now affirm the superior court.  We hold that the State has failed to carry its burden of showing the existence of an explicit, well-defined, and dominant public policy against enforcing the arbitrator's award in this case.  While Alaska's laws are *explicit* in favoring an honest police force, they are not explicit in requiring a policy of absolute zero tolerance toward any dishonesty by law enforcement officials, no matter how minor.  Nor are Alaska's laws *well-defined* in specifying where, precisely, to draw the line between categorically unacceptable dishonesty and dishonesty that does not require termination.  To the extent that Alaska's laws would permit the termination of a police officer for relatively minor acts of dishonesty, this policy is not *dominant,* because the State has shown lenience for minor acts of

---

53. 13 Alaska Administrative Code (AAC) 85.900(7) (2005).  Of the five "indicia of a lack of good moral character" laid out in the regulation, two involve dishonesty: first, "conduct involving moral turpitude, including dishonesty, fraud, deceit, or misrepresentation"; and second, "intentional deception or fraud, or attempted deception or fraud in an application, examination, or other document for securing employment, eligibility, or certification."  *Id.*  The latter emphasizes the gravity of being dishonest in a document for securing employment, eligibility, or certification.

54. 13 AAC 85.040(b)(5) (2005).

55. 13 AAC 85.110(b) (2005).

56. State of Alaska, Department of Public Safety, Operating Procedures Manual 101.050.

dishonesty in the past, as we will describe in greater detail below.

We will only intervene in the bargained-for labor agreement between the State and PSEA on public policy grounds where the arbitrator's award violates an explicit, well-defined, and dominant public policy. That is not the case here.

It would be unwise to attempt to define in advance the outer limits of the enforceability of labor arbitration awards. The judicially created public policy exception to labor arbitration awards is a fact-specific, contextually sensitive doctrine and therefore well suited to development through the common law mode of adjudication. Only in the light of concrete cases will the precise contours of the public policy exception become visible.

But because we recognize that uncertainty has costs in the context of the judicial review of arbitration awards, we offer the following guidance. In the present case, none of the sources of law cited by the State clearly sets out a public policy as to the minimal consequences that must follow when law enforcement officers commit minor acts of dishonesty that are not directly related to their duties to the public, that are not directed toward superiors in their chain of command, and that do not arise in the context of a formal investigation. If these factors had been sufficiently different—in particular, if the Trooper had lied to a superior within the scope of a formal investigation directly related to his duties to the public—our public policy analysis would likely have reached a contrary result. Even PSEA's attorney acknowledged during oral argument that such a case would be materially different than the present one.[57]

■ We emphasize the following common principles from our review of the case law of other jurisdictions: (1) the public policy exception to labor arbitration disputes involving public employees in positions of public

trust is most clearly applicable where a statute or regulation compels the termination (or prevents the hiring) of an employee for committing the relevant misconduct; (2) the relevant inquiry is whether the arbitrator's decision to reinstate the employee violates public policy, not whether an employee's conduct does, so statutes or regulations that merely prohibit the conduct are insufficient to support the public policy exception; and (3) a court should be particularly vigilant where the employee's misconduct was in the performance of his or her duties and directed toward the public, and could therefore undermine confidence in public institutions that rely upon the public's trust.

### B. The Arbitrator Did Not Commit Gross Error In Concluding That There Was Not Just Cause To Discharge The Trooper.

The State makes several arguments under the heading of gross error. We address each of the arguments in turn, ultimately affirming the superior court's determination that the arbitrator did not commit gross error.

#### 1. The arbitrator did not commit gross error by reinstating a dishonest trooper to a position of public trust.

The State's argument here rests on the analogy between the present case and our decision in *Alaska State Employees Ass'n/ AFSCME Local 52 v. State*,[58] where we vacated an arbitrator's decision because we concluded that "the arbitrator committed gross error in applying the standard she chose" for evaluating just cause.[59] In that case, the State terminated an administrative clerk employed by the Child Support Enforcement Division (CSED) of the Alaska Department of Revenue after discovering that she had pled guilty to felony theft of public money.[60] The clerk had access to a database containing "personal information

---

**57.** Specifically, PSEA's attorney stated that if the arbitrator had found that the Trooper was dishonest when he was dealing with the public, or was abusing his role, "then I don't think we would even be here. Because PSEA is not going to ... stand and argue that a police officer who abuses his authority and ... violates the public trust should be employed. As a union we're not

going to stand here and argue that that is something this court should allow."

**58.** 74 P.3d 881 (Alaska 2003).

**59.** *Id.* at 884.

**60.** *Id.* at 881.

about parents, including Social Security numbers, bank account numbers, and other sensitive, private information." [61]

We vacated an arbitrator's reinstatement of the employee because the arbitrator's findings established that the clerk had been convicted of felony theft of public money, "that the [clerk] had access to confidential information and held a position of trust with CSED," and that a personnel hiring rule allowed the State to disqualify applicants solely based on a felony conviction that could be relevant to the performance of anticipated duties.[62] "Given the arbitrator's findings," we held "that the arbitrator committed gross error in determining that the termination was not for just cause." [63]

The present case is distinguishable: The Trooper was convicted of no crime, and the arbitrator employed a different and apparently far more strict test of just cause, as described in greater detail below. Under that standard, it was not gross error for the arbitrator to conclude the State lacked just cause to terminate the Trooper. Also, we have already refused to extend the reasoning of *Alaska State Employees Ass'n/AFSCME Local 52* to an arbitrator's reinstatement of a grievant who "has not been convicted of a felony and is not alleged to have engaged in felonious conduct." [64]

## 2. The arbitrator did not commit gross error in the disparate treatment portion of his just cause analysis.

█ As a preliminary matter, the State notes that the arbitrator in this case did not

apply the "just cause" standard established by this court in *Manning v. Alaska Railroad Corp.*[65] But we have also explicitly held that an arbitrator's "use of a well-reasoned alternative definition" of just cause "would not alone constitute gross error." [66]

The State then suggests that "[t]he arbitrator's failure to present a legally-supported and well-reasoned just cause analysis, in and of itself, may constitute gross error." It is true that the arbitrator does not spell out the elements of his approach to just cause nor cite to any precedent. The closest the arbitrator comes to articulating his just cause standard is to note that "the doctrine of disparate treatment is a well-accepted aspect of the just cause doctrine." PSEA argues that the reference to disparate treatment shows that the arbitrator was applying a seven-factor test that is widely accepted in the arbitration community, and that includes disparate treatment as one of its elements.[67] A recent opinion by the Washington Court of Appeals supports the conclusion that the seven-factor test is in fact widely used.[68]

But even if the arbitrator was using the seven-factor test instead of Alaska's just cause doctrine, and even if the seven-factor test is not, in fact, as widely used as PSEA suggests, the arbitrator's choice of another just cause doctrine was not gross error. As the Court of Appeals of Ohio concluded, "[i]f either party wanted a more specific definition of 'just cause,' it could have bargained for it. But [i]n the absence of an express provision to the contrary, it [is] for the arbitrator to determine the meaning of 'just cause.' " [69]

**61.** *Id.* at 881–82.

**62.** *Id.* at 885.

**63.** *Id.*

**64.** *PSEA 2010,* 235 P.3d 197, 201 (Alaska 2010).

**65.** " '[J]ust cause' for discharge is one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true." *Alaska State Emps. Ass'n/AFSCME Local 52,* 74 P.3d at 883–84 (quoting *Manning v. Alaska R.R. Corp.,* 853 P.2d 1120, 1125 (Alaska 1993)).

**66.** *Id.* at 884.

**67.** The Alaska State Employees Association made a similar argument in *Alaska State Emps. Ass'n/ AFSCME Local 52. Id.* at 886. We noted the existence of the seven factors but refrained from reaching the issue of whether the arbitrator had relied on them. *Id.*

**68.** *See City of Seattle, Seattle Police Dep't v. City of Seattle, Pub. Civil Serv. Comm'n,* 155 Wash. App. 878, 230 P.3d 640, 644 (2010) ("[T]he 'seven tests' analysis articulated by labor arbitrator Carroll R. Daugherty in 1964 [is] now widely used to guide arbitrations under collective bargaining agreements.").

**69.** *Piqua v. Fraternal Order of Police,* 185 Ohio App.3d 496, 924 N.E.2d 876, 887 (2009) (internal quotation marks omitted).

The State cites to no provision of the Collective Bargaining Agreement containing a definition of just cause different from the one used by the arbitrator.

The State next argues that the arbitrator's disparate treatment analysis was insufficiently reasoned or supported to justify his conclusions. The arbitrator recognized that the Trooper's misconduct "is typically viewed as warranting termination," but based his decision to reinstate largely on the disparate treatment doctrine. The arbitrator reasoned that "[i]f the State's history demonstrated it had substantially restricted the [Trooper's] work assignments or if it had not created a history of lenient behavior toward similarly situated employees, its action would be sustained." But the State did not restrict the Trooper's work assignments. Its response to the Trooper's admitted dishonesty "was to return the [Trooper] to work and keep him involved in the processing of cases for several months. In doing so it undermined its own asserted reasons for his discharge: that it could not tolerate anything less than a wholly honest trooper."

The State even gave the Trooper "an evaluation that rated him at acceptable levels ... and recommended a merit increase." In addition, the State failed to show the Trooper deserved "more serious discipline" for his misconduct than "other even more experienced troopers." Because of the State's failure to rebut the affirmative defense of disparate treatment, the arbitrator concluded "that discharge was too harsh when measured by the disparate treatment doctrine."

The State attempts to demonstrate that the arbitrator's conclusion was gross error by distinguishing between past disciplinary incidents and the incidents used to support the Trooper's termination in this case. The State argues that the more experienced troopers who received less severe punishments for their dishonesty were only *accused* of dishonesty, not *found* to be dishonest as the Trooper was. There is some merit to the State's claim. The disciplinary investigation in the record that is most analogous to the present case deals with a trooper who made unwanted sexual advances toward a woman,

including "[giving] her some panties and engag[ing] in sexually suggestive conversations with her." When asked by the investigating officer whether he had given the woman any gifts, including garments, the trooper said "no." The investigating officer found it unsettling that the trooper had "been less than forthcoming and honest in [his] responses," and noted that the trooper's responses "to a Supervisor's questions" were "misleading or evasive." On a review of the case, a higher-ranking officer stated: "I find that ... [the investigating officer] had reasonable grounds to arrive at his conclusion that you were deceptive with him during your meeting," and "I support [the investigating officer's] findings." The higher-ranking officer added that "[i]f viewed in a negative light, the facts that I reviewed would in fact support a finding that you intentionally lied to your supervisor in response to his direct and clear questions."

The State is thus correct to say that the trooper in this earlier investigation was not technically found to have intentionally lied. But he was found to have been deceptive, misleading or evasive, and less than forthcoming and honest, and on review an officer concluded that the facts would have supported finding him to have intentionally lied. Yet despite the fact that the trooper in the earlier case was apparently more experienced than the Trooper in the present case, he received only a reprimand, while the Trooper in the present case was terminated. In light of these circumstances, it was not gross error for the arbitrator to conclude that the Trooper here received disparate treatment.

### 3. The arbitrator did not commit gross error in ordering reinstatement because the Trooper will be unable to testify.

The State argues that the arbitrator committed gross error in ordering reinstatement because the Trooper's discipline for dishonesty will negate his ability to testify, which is an integral part of his duties. According to the State, the U.S. Supreme Court's decision in *Brady v. Maryland*[70] requires that "evi-

70. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215    (1963).

dence of this Trooper's discipline for dishonesty must be disclosed to the defense when this Trooper is a prosecution witness in a criminal case." "Because the Trooper will have a record of discipline for dishonesty, his ability to serve as a credible and trustworthy witness will be seriously jeopardized."

But PSEA disputes the State's argument on multiple, largely factual grounds. "[T]he State has not offered any evidence in the arbitration, in the Superior Court, or now, that troopers who have a record of discipline for dishonesty have been unable to testify regarding their role in arrests and investigations, nor that such troopers have been precluded from useful service as a law enforcement officer." And arguments are waived on appeal if they are inadequately briefed.[71] It is unclear from the State's briefing how its argument regarding *Brady* relates to an analysis of the arbitrator's decision for gross error. The State never makes clear how the arbitrator's decision constitutes an obvious mistake under *Brady,* or how this mistake relates to the arbitrator's just cause analysis. If the State intends us to apply a higher standard of scrutiny to the arbitrator's factual findings regarding the *Brady* issue than the deferential standard we apply to the arbitrator's other factual findings, it has not said so. The State's argument is waived.

## V. CONCLUSION

We emphasize that nothing in this opinion should be taken as a precedent for excusing or minimizing the significance of even minor acts of dishonesty by law enforcement officers and other employees in positions of public trust. If we had stood in the arbitrator's place, we may well have determined that under Alaska's doctrine of "just cause," the State did have just cause to terminate the Trooper.[72] Lying—even temporarily—to cover up one's misbehavior should be recognized as conduct unworthy of an Alaska state trooper.

We are also deeply troubled by the arbitrator's suggestion that the State's past lenience toward minor dishonesty requires it to be permanently lenient. There is merit to the State's argument that the arbitrator's "application of the disparate treatment doctrine in this situation allows for perpetuation of dishonesty." Under the arbitrator's reasoning, if the State shows lenience regarding some misconduct when it first arises, then the State may be condemned to tolerate the misconduct permanently as a result of the disparate treatment doctrine. But surely the State should be free to heighten its enforcement of ethical standards. The disparate treatment doctrine should not operate as a one-way ratchet toward the acceptance of increasingly unethical behavior.

Arbitrators should consider that when an instance of discipline presents itself as lenient, it offers as much of a precedent for harsher future treatment as it does for a repetition of the lenience. In the earlier incident involving the trooper who made inappropriate sexual advances, the reviewing officer explicitly noted that "I feel that the Department was quite gracious to you.... The Department gave you the benefit of the doubt in reviewing this event and in taking discipline to correct your actions." By definition, lenience implies that a more severe punishment could also have been appropriate. Thus the earlier incident provides a precedent for the appropriateness of harsher treatment for a subsequent offense, perhaps including the punishment the Trooper in the present case received.

■ But we are bound by the gross error standard, and it was not gross error for the arbitrator to have taken a different approach from the one we may have taken. "A court may not vacate an arbitrator's interpretation of a collective bargaining agreement in favor of its own merely because it finds its own to

---

**71.** *Barnett v. Barnett,* 238 P.3d 594, 598 (Alaska 2010).

**72.** As noted above, in Alaska a "just cause" for discharge is "one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true." *Manning v. Alaska R.R. Corp.,* 853 P.2d 1120, 1125 (Alaska 1993) (quoting *Braun v. Alaska Commercial Fishing & Agric. Bank,* 816 P.2d 140, 142 (Alaska 1991) (internal quotation marks omitted)).

be better reasoned."[73]  It is not an obvious mistake to reject as disparate treatment the termination of a trooper primarily for conduct that is arguably less egregious than that for which another trooper received only a reprimand.

Because there is no explicit, well-defined, and dominant public policy in Alaska against the reinstatement of a law enforcement officer who has engaged in relatively minor dishonesty, and because the arbitrator did not commit gross error in determining that the State lacked just cause to terminate the Trooper, we AFFIRM the superior court's upholding of the arbitrator's decision.

CHRISTEN and STOWERS, Justices, not participating.

---

**73.**  *Dep't of Pub. Safety v. Pub. Safety Emps. Ass'n,*  732 P.2d 1090, 1093 (Alaska 1987).