MAASSEN, Justice,
with whom STOWERS, Justice, joins, dissenting.
I respectfully dissent. I would hold that a contractual arbitration remedy requiring that a state trooper be reinstated after his commander has, with very good reason, lost confidence in the trooper's judgment, moral *687 character, and effectiveness as a law enforcement officer violates Alaska public policy. I recognize that the public policy exception to the enforcement of arbitration awards is sparingly applied. But the court today requires an unrealistic degree of precision from the codes of acceptable conduct that other branches of government are entitled to expect their employees to follow.
The arbitrator found in this case (and the court appropriately defers to its findings) that the Trooper-Grievant was called to the home of M.H. to provide backup for another trooper, Trooper C, who was investigating a report of domestic violence; that M.H.'s husband, because he believed MH. was being unfaithful to him with yet another state trooper (Trooper @), had "threatened her and placed her in fear"; that it was the Trooper-Grievant's duty to read and explain to MH. her rights as a victim of domestic violence while Trooper C interviewed another witness in another part of the house; that the troopers arrested M.H.'s husband and took him to jail; that early the next morning the Trooper-Grievant, now off-duty, texted MH. and provided her with his personal telephone number; that after talking with MH. on the telephone he returned to her home out of uniform at 6:00 a.m., where he found her to be "still upset" and "feeling that she was 'done with' her marriage"; and that the Trooper-Grievant and MH. then had consensual sex in her home, while her husband was in jail on charges that he had assaulted her the night before because of jealousy prompted by her suspected adultery with a state trooper.[1]
The court also accepts that the fact of this sexual encounter became known to the husband and his defense attorney, and that it had some impact, albeit "minimal," on the district attorney's decision to drop an assault charge based on the husband's encounter with Trooper C and to reduce to harassment the assault charge involving M.H.[2]
The court also recites the governing police standards of conduct alerting officers that "every possible act that constitutes unacceptable behavior" cannot be spelled out explicitly; that "[clonduct that shocks the conscience or that violates generally recognized standards of professional behavior is forbidden"; and that how officers conduct themselves in their professional and private lives, "both on and off duty," is subject to the same high standards of honor and decency.[3] The court quotes the resulting termination letter to the Trooper-Grievant stating that "despite your knowledge of this woman's vulnerable condition after her recent domestic violence vie-timization, you put yourself, this agency, the District Attorney's Office and the criminal prosecution of this case in jeopardy by surrendering to the temptations of a sexual encounter" and characterizing the Trooper-Grievant's conduct as "shocking" and "a discredit" to the Department of Public Safety.[4]
The court further acknowledges that Alaska's constitution, statutes, and regulations "support the conclusion that Alaska has a {public} policy to protect vietims and prohibit sexual misconduct." [5] It concludes, however, that none of these legal sources articulates "an explicit, well-defined, and dominant pub-lie policy" that would bar reinstatement of the Trooper-Grievant despite his reprehensible conduct.
A. -The Court Too Narrowly Defines Its Role In Identifying Public Policy.
I begin my legal analysis, as the court does, with a recitation of the three "common principles" that our precedent requires us to consider:
(1) the public policy exception to labor arbitration disputes involving public employees in positions of public trust is most *688 clearly applicable where a statute or regulation compels the termination (or prevents the hiring) of an employee for committing the relevant misconduct; (2) the relevant inquiry is whether the arbitrator's decision to reinstate the employee violates public policy, not whether an employee's conduct does, so statutes or regulations that merely prohibit the conduct are insufficient to support the public policy exception; and (8) a court should be particularly vigilant where the employee's misconduct was in the performance of his or her duties and directed toward the public, and could therefore undermine confidence in public institutions that rely upon the publics trust.[6]
That the public policy exception is "most clearly applicable where a statute or regulation compels the [employee's] termination" necessarily means that the exception may also apply, though less "clearly" so, where a statute or regulation does not compel the termination. This is consistent with the Restatement law from which we drew our guiding principles. In PSEHA 2011, relying on our earlier decision in Pavone v. Pavone,[7] we highlighted the Restatement's recognition that
[olnly infrequently does legislation, on grounds of public policy, provide that a [contract] term is unenforceable. When a court reaches that conclusion, it usually does so on the basis of a public policy derived either from its own perception of the meed to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about un enforceability." [8]
We elaborated on this point in PSEA 2011 by reciting more extensively, and approvingly, from the same Restatement comment:
In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unen-forceability is plain. In other cases the contravention is so trivial as that it plainly does not preclude enforcement. In doubtful cases, however, a decision as to enforceability is reached only after a careful balancing, in the light of all the cireum-stances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms.... Enforcement will be denied only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the particular term.[9]
And we explicitly stated in PSEA 2011 that our decision in that case was "consonant with the general guidance offered in Pavone" and with the Restatement principles on which Pavone was decided.[10]
Because of this express sourcing of our guiding principles, endorsed in PSEA 2011, [11] I cannot read PSEA 2011 as requiring in every case that there be explicit direction from the executive or legislative branch that the specific conduct at issue prohibits hiring
*689 or reinstatement. - Rather, in dle ground of "doubtful cases" between those in which "unenforceability is plain" and those in which "the contravention is so trivial that it plainly does not preclude enforcement," we are expected to do "a careful balancing,[12] keeping in mind that in those "doubtful cases" there is unlikely to be any express legislative or regulatory direction. The court operating in that middle ground must rely instead on its own historical ability to derive the relevant "explicit, well-defined, and dominant public policy" "either from its own perception of the need to protect some aspect of the public welfare or from legislation that is relevant to that policy although it says nothing explicitly about unenforceability."[13]
B. Public Policy Requires That The Trooper-Grievant Not Be Retained.
Blinkered to the breadth of the allowable inquiry, the court today looks for-and fails to find-"any explicit, well-defined, and dominant public policy requiring termination, rather than suspension, as the only proper discipline for a trooper's consensual and noncriminal sexual misconduct." [14] But while the phrase "consensual and non-criminal sexual misconduct" is useful shorthand for discussion purposes, it omits everything that establishes the gravity of the Trooper-Griev-ant's misconduct: sex by a responding officer with a distraught domestie-violence victim within hours of the alleged crime, likely leaving her in a more vulnerable position when the encounter came to light (particularly as her husband's anger stemmed in the first place from her alleged unfaithfulness with another trooper), damaging the State's prosecution of the husband for the crime of domestic violence, damaging the State's prosecution for the assault on Trooper C, and
damaging the Trooper-Grievant's future effectiveness as a witness.
As noted above, the court today agrees that the sources of authority on which the State relies "support the conclusion that Alaska has a [public] policy to protect victims and prohibit sexual misconduct." [15] I would go a step further; I believe one of those sources, 13 AAC 85.110(b), supports the conclusion that a police officer who violates that public policy in a clearly serious way should no longer be employed. That regulation provides:
The council shall revoke a basic, intermediate, or advanced certificate upon a finding that the holder of the certificate ... (8) has been discharged, or resigned under threat of discharge, from employment as a police officer in this state or any other state or territory for conduct that would cause a reasonable person to have substantial doubt about an individual's honesty, fairness, and respect for the rights of others and for the laws of this state and the United States or that is detrimental to the integrity of the police department where the police officer worked.[16]
Discussing this regulation in PSEA 2011, we acknowledged that it "strongly suggests that it is the policy of the State of Alaska not to employ dishonest police officers," but we con-eluded that it was "unclear whether the regulation means to prohibit the employment of police officers who have been dishonest to any degree or under any circumstance." [17] I believe this to be a slight misconstruction of the regulation and one we are mistaken to carry forward. The regulation is indeed very clear that it means to prohibit the employment of police officers who have been dishonest (or who have engaged in sexual misconduct or the exploitation of domestic violence *690 victims or the misuse of their official position) to some degree and under some cireum-stances; that is, where the conduct, whatever it is, "would cause a reasonable person to have substantial doubt about an individual's honesty, fairness, and respect for the rights of others and for the laws of this state and the United States or that is detrimental to the integrity of the police department where the police officer worked." A "reasonable person" standard is common in the law and presumed to be generally understood.[18] I find the regulatory language to be more than sufficient to satisfy the Restatement's guiding principles for determining public policy, particularly the instruction that in "doubtful cases" we conduct a "careful balancing" of the interests in favor and against enforcement of the award.[19] One of those interests, poignant under the facts of this case, we highlighted in PSEA 2011: that we "be particularly vigilant where the employee's misconduct was in the performance of his or her duties and directed toward the public, and could therefore undermine confidence in public institutions that rely upon the public's trust.[20]
The court today concludes that just as there are gradations of dishonesty that public policy will tolerate in its police officers, so too there are gradations of sexual misconduct and the exploitation of victims of domestic violence. That may well be true. But as the guiding principles in the Restatement and Pavone instruct us, it is unrealistic to expect other branches of government to have identified the factual context of every possible instance of misconduct, to have ranked them, and to have drawn precisely the line at which the misconduct becomes intolerable as a pub-lie policy matter. Every instance of potential misconduct need not be predicted in luminous detail before we can find "an explicit, well-defined, and dominant public policy" against it. The Department of Public Safety has done what it reasonably could be expected to do by emphasizing, time and again, how important it is that police officers act with dignity and respect both on and off the job.[21] There seems little room for debate that the conduct at issue here is such as "would cause a reasonable person to have substantial doubt about [the officer's] honesty, fairness, and respect for the rights of others and for the laws of this state and the United States"; and it cannot reasonably be disputed that the conduct "is detrimental to the integrity of the police department where the police officer worked.[22] The court today is unwilling to say so.
I believe it should. To summarize: It violates Alaska public policy when police officers engage in sexual misconduct and the exploitation of domestic violence victims; the Trooper-Grievant's misconduct in this case, *691 in violation of that policy, was serious and reprehensible; and 18 AAC 85.110(b) directs, in language that is sufficiently clear, that an officer who engages in serious misconduct in violation of compelling public policy not be retained. Necessarily, an arbitration decision requiring that the officer be retained under those cireumstances is itself in violation of public policy.
I would therefore vacate the arbitrator's award.

. Op. at 672-73.

. Id. at 673.

. Id. at 673, n. 3.

. - Id. at 673-74.

. Id. at 683. See also id. at 679 ("Article I, section 24 provides that '[c}rime victims ... shall have ... the right to be treated with dignity, respect, and fairness during all phases of the criminal and juvenile justice process.'"); id. at 20 ("It is true that [AS 18.66.010] expresses the State's public policy of aiding domestic violence victims.").

. Op. at 676, n. 14 (quoting State v. Pub. Safety Emps. Ass'n, 257 P.3d 151, 162 (Alaska 2011) (PSEA 2011 )) (emphasis added).

. 860 P.2d 1228, 1231 (Alaska 1993).

. 257 P.3d at 159 (emphasis added) (quoting Pavone, 860 P.2d at 1231 (quoting Restatement (SEconp) or Contracts § 178(2) emt. b (1981))).

. Id. at 159 n. 38 (quoting Restatement (Seconp) or Contracts § 178(2) emt. b (1981).

. Id. at 159-60.

. Today's opinion faults my analysis for relying too heavily on the Restatement principles we endorsed in PSEA 2011. Op. at 677-78. We expressly adopted the test of Restatement § 178 in Pavone, holding that in future cases, when faced with ambiguous public policy, "we will apply the factors listed in subsections 2 and 3 of [Restatement] section 178 to determine whether the term should be enforced." 860 P.2d at 1232. These sections do not even apply unless "there is no legislation specifically prohibiting enforcement of the promise or contractual term." Id. at 1231. In PSEA 2011 we stated that the public policy exception to the enforcement of arbitration awards that we were adopting was consistent with Pavone. PSEA 2011, 257 P.3d at 158-59. The basic principles about the unenforce-ability of illegal contracts should not apply in only a watered-down version in the context of public employee arbitration awards, where the public interest in judicial review is considerably greater than it is with private contracts.

. PSEA 2011, 257 P.3d at 159 n. 38 (quoting Restatement (SEconp) or Contracts § 178 cmt. b (1981)).

. Id. at 159 (quoting ResraremeNnt (Seconp) or Contracts § 178 emt. b (1981)).

. Op. at 683.

. Id. See also id. at 679 ("Article I, section 24 provides that [crime victims ... shall have ... the right to be treated with dignity, respect, and fairness during all phases of the criminal and juvenile justice process.' "); id. at 680 ("'It is true that [AS 18.66.010] expresses the State's public policy of aiding domestic violence victims.").

. 13 AAC 85.110(b).

. 257 P.3d at 161.

. 'The reasonable person standard is a hallmark of the Anglo-American legal system," which "assures that 'the person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly' "; it "also serves to prevent any ad hoc and subjective application by police officers, judges, juries, or others empowered to enforce [the standard]." Twp. of Plymouth v. Hancock, 236 Mich.App. 197, 600 N.W.2d 380, 383 (1999) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). See also Stevens v. Matanuska-Susitna Borough, 146 P.3d 3, 10-11 (Alaska App.2006) (quoting City of Beaufort v. Baker, 315 S.C. 146, 432 S.E.2d 470, 474 (1993)) (''The objective 'reasonable' test is used in many areas of the law as an appropriate determinant of liability and thus a guide to conduct."); City of Madison v. Baumann, 162 Wis.2d 660, 470 N.W.2d 296, 302 (1991) (''The reasonable-person standard is one that has been relied upon in all branches of the law for generations.").

. PSEA 2011, 257 P.3d at 159 n. 38 (quoting ResratemEnt (Seconp) or Contracts § 178(2) emt. b (1981).

. Id. at 162.

. See, eg., AS 18.65.130 (establishing minimum standards for employment as a police officer); AS 18.65.240(c) (providing that the Alaska Police Standards Council may revoke the certificate of a police officer who fails to meet moral character standards); 13 AAC 85.100(a), (b) (listing justifications for denying police certificates); 13 AAC 85.110(a)(2), (3) (delineating implementation of revocation authority, including discretionary revocation for actions detrimental to the reputation or integrity of the police department); Department of Public Safety Operating Procedures Manual (prohibiting behavior that "shocks the conscience or that violates generally recognized standards of professional behavior' and that ''brings the Department into disrepute").

. 13 AAC 85.110(b).