2013 VT 42

## Kevin Turnley v. Town of Vernon

[71 A.3d 1246]

No. 12-098

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed June 21, 2013

*Sharon L. Annis* of *McCarty & Buehler, P.C.*, Brattleboro, for Plaintiff-Appellee.

*John T. Leddy* and *Kevin J. Coyle* of *McNeil, Leddy & Sheahan, P.C.*, Burlington, for Defendant-Appellant.

¶ 1. **Reiber, C.J.** The Town of Vernon appeals the superior court's reversal of its decision to fire police chief Kevin Turnley. The Town Selectboard determined that the chief made inaccurate statements when asked at public meetings about when he learned of a low-level sex offender's residence and about why he did not inform the community. Because the Board failed to make expressly the findings necessary to support its action, we affirm the superior court's judgment.

¶ 2. The Board's allegations center on two separate occasions in October 2009 when the chief responded to questions about his knowledge of a low-level sex offender's residence in the town. The record reveals the following. At some time in October after the alleged misrepresentations, the Board sent an undated letter to the chief, accusing him of dereliction and conduct unbecoming an officer. The Board informed the chief that his employment was terminated immediately and that it had scheduled a hearing as required by 24 V.S.A. § 1932(a). The letter specified, in relevant part:

> The Selectboard has concluded that you have been derelict in your official duty, and that you are guilty of conduct unbecoming an officer, in that you knowingly and deliberately made false statements to the Board and to the public at two public meetings concerning your knowledge related to a potential public safety issue, in particular, the residence in the Town of Vernon of a registered sex offender.

¶ 3. At the hearing, the Board reiterated the charges it outlined in the letter and called a series of witnesses to describe the chief's receipt of an e-mail from the state Department of Public Safety regarding the relocation of a sex offender and the chief's subsequent public statements. The Board introduced a copy of an August 13, 2009, e-mail addressed to the chief and advising him that a man with a conviction for "criminal sexual misconduct with a minor" had moved into the town. A police administrator testified that the chief gave her a copy of the e-mail on August 14 and asked her to place it in the so-called "offender's book." The administrator did not herself have access to the e-mail account that received the notification. The e-mail did not provide any details regarding the offender's previous address or whether he was subject to any ongoing correctional supervision. The admin-

istrator testified that the e-mail's contents did not require community notification. See 13 V.S.A. §§ 5411, 5411a (regarding sex-offender registration and law-enforcement duties).[1]

¶ 4. With regard to the first alleged misrepresentation, the Board called two witnesses, who testified that at an October 6, 2009, public meeting the chief was asked why his department had not notified the public about the residence of the man referenced in the August e-mail. According to these witnesses, the chief said the department did not do so because he did not receive the notice directly and had learned of the offender's residence only a day or two before the October meeting.

¶ 5. The Board then called the Board secretary to verify the contents of minutes and a partial transcript she had prepared of the Board's October 19, 2009, meeting, when the chief made his second alleged misrepresentation. According to the transcript, the Board's chairman asked the chief about his October 6 statements. The exchange, as recounted in the partial transcript and minutes, went as follows:

> [CHAIRMAN:] Now I'm confused as to when you knew when we had that meeting the other night you were saying that you hadn't known for very long [about the offender's residence]. When were you told about it as far as the sex offender registry [giving] you the notification?

---

[1] The administrator's testimony appears to suggest the chief would have had a statutory duty to notify the community of the offender's presence if his conviction or classification had been different. The e-mail the chief received lacked specifics regarding the offender's conviction. In any event, any such duty would be found in the Town's regulations or department policies to which this Court has not been referred by either party. The sex-offender-reporting statutes impose a duty on local law enforcement to release certain types of registry information only upon inquiry by a member of the public about a specific individual, or for certain offenses requiring electronic posting. See generally 13 V.S.A. §§ 5411, 5411a. In the case of requests for information regarding sex offenders whose crimes do not trigger Internet reporting under 13 V.S.A. § 5411a, requesters must meet certain criteria before police are required to release registry details. See 13 V.S.A. § 5411(b)(1) (law enforcement required to release registry information when those seeking the information can articulate a safety concern about a specific person who they have reason to believe is a registered sex offender or whose behavior prompts an articulable worry). Otherwise, active community notification by law enforcement is discretionary and permitted only based on an offender's heightened classification or in the case of "a compelling risk to public safety and [then] only after consultation with the Vermont [C]rime [I]nformation [C]enter and the department of corrections." 13 V.S.A. § 5411c(b).

[CHIEF TURNLEY:] Rebecca had an e-mail that she showed me, I do not recall getting the e-mail it did not have my e-mail address at the bottom of it. So as far as when he moved in it was a short time before the meeting.

[CHAIRMAN:] [S]o you didn't talk to them [at] the [s]ex offender registry?

[CHIEF TURNLEY:] [N]o not until it was like a day or two days before I had gotten a call from Sherry and I had spoken to her.

¶ 6. The chief's attorney declined to present any evidence at the termination hearing, calling into question the Board's objectivity and describing the proceedings as "a farce" and "a controlled[,] contrived termination of the Chief." At the conclusion of the hearing, the chief's attorney moved to dismiss the charges, arguing the Board members had acted improperly as prosecutors and fact finders, had engaged in inappropriate communication directly with witnesses, and had demonstrated bias.

¶ 7. The Board rejected the chief's attorney's procedural objections and determined the chief received notice that the offender moved into the jurisdiction on August 13, 2009, and that the chief twice made false statements about his knowledge of the sex offender's presence — once at the October 6, 2009, public meeting and a second time at the October 19, 2009, Selectboard meeting.[2] If the Board believed the chief knowingly or intentionally misstated the facts, it did not specifically or expressly say so.

¶ 8. The chief appealed the Board's decision to the superior court, which conducted an on-the-record review in accordance with Vermont Rule of Civil Procedure 75. The record consisted of a 2009 employee evaluation[3] and certified copies of the Board's deliberative materials, including, among other things, a copy of an October 2009 e-mail addressed to the chief notifying him of the

---

[2] The Board's December 2009 Report of the Results of the Deliberative Process incorrectly refers to the chief's public statements as "false testimony." As the trial court properly noted, the statements in question were not testimony. Testimony is defined as "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition." Black's Law Dictionary 1514 (8th ed. 2004).

[3] The employee evaluation figured in the record submitted to the superior court but apparently played no role in the Board's determination and was accordingly not weighed by the superior court.

newly resident sex offender; a transcript of the November 9, 2009, termination hearing; and sworn statements from members of the Selectboard and witnesses.

¶ 9. In superior court, the chief renewed the objections lodged at the Board hearing and argued that the grounds for his firing were insufficient as a matter of law. In an eighteen-page order, the superior court rejected the chief's procedural and due-process claims but reversed the Board's decision to fire him, after concluding that the "termination of [the chief's] employment on account of these two false, but perhaps simply mistaken statements is so disproportionate to the misconduct that it cannot be sustained, as a matter of law." In particular, the court concluded that the evidence supported the determination that the chief twice made inaccurate statements regarding his awareness of the sex offender's presence. Nevertheless, the court was "unable to find evidence in the record to confirm that the statements were made *with knowledge of their falsehood.*"

¶ 10. The Town now appeals, urging this Court to reinstate the Board's decision. The Town argues principally that the Board possessed the discretion to fire the chief for dishonesty and that substantial evidence supported its decision to do so. It further contends that the superior court improperly reweighed the evidence to arrive at its own factual findings rather than reviewing the record simply to determine if there was competent evidence to support the Board's findings and whether those findings supported its conclusions.

¶ 11. On appeal of a Rule 75 determination, we apply the same standard as the trial court. *Rhoades Salvage/ABC Metals v. Town of Milton Selectboard*, 2010 VT 82, ¶ 13, 188 Vt. 629, 9 A.3d 685 (mem.). "Under V.R.C.P. 75, review in superior court by way of appellate review or certiorari is virtually synonymous." *Hunt v. Vill. of Bristol*, 159 Vt. 439, 441, 620 A.2d 1266, 1267 (1992). This review is confined to questions of law and encompasses the consideration of "evidentiary points only insofar as they may be examined to determine whether there is any competent evidence to justify the adjudication, much as in the case of a motion for a directed verdict." *Id.* (quoting *Royalton Coll., Inc. v. State Bd. of Educ.*, 127 Vt. 436, 447-48, 251 A.2d 498, 506 (1969)). "Discretionary rulings may be set aside only for abuse and the judgment is not reviewable on the merits." *Id.* Under the deferential standard

of review accorded administrative and quasi-judicial bodies in these circumstances, it is not for the superior court to independently weigh the evidence to make its own factual findings. Rather, the superior court on a Rule 75 appeal must uphold factual findings if any credible evidence supports the conclusion by the appropriate standard. See *In re D'Antonio*, 2007 VT 100, ¶ 9, 182 Vt. 599, 939 A.2d 493 (mem.); see also *Yoder v. Town of Middleton*, 876 A.2d 216, 218 (N.H. 2005) ("Our standard is not whether we would have ruled differently, but *whether a reasonable person could have reached the same decision as did the [Board] based upon the evidence before it.*") (emphasis added). With respect to an officer's dismissal,

> [i]t is not necessary that the alleged conduct be criminal in character nor that it be proved beyond a reasonable doubt. . . . It is elementary that the measure of proof to convict for a criminal offense is substantially different and greater than that necessary to support the dismissal of a municipal employee.

*In re Zeber*, 156 A.2d 821, 825 (Pa. 1959). The conclusions must, however, be supported by the findings.

¶ 12. We need not address the sufficiency of the evidence adduced during the Selectboard hearing because we conclude that the Board simply did not make the findings required to support its actions. We therefore affirm the superior court's reversal of the Town's action. See *Gochey v. Bombardier, Inc.*, 153 Vt. 607, 613, 572 A.2d 921, 925 (1990) ("[W]e may affirm a correct judgment even though the grounds stated in support of it are erroneous."). The Board's written findings do not make clear whether it actually concluded the chief knowingly and deliberately misled the public. In its dismissal letter, the Selectboard alleged that the chief had "knowingly and deliberately" made false statements. In the notice of the hearing, the Board used the same phrase. In its decision, however, the Board expressly found that the chief gave "false testimony" without reference to his state of mind. The term "testimony" in this situation was ill-advised, as the chief had not been under oath at the time of the statements in question. To compound the ambiguity of the Board's finding, as we have noted, the term "false testimony" generally refers to "testimony that is untrue," and does not necessarily signify a state-of-mind element. In contrast, the term "false statement" generally suggests an

intent to mislead. Given the lack of clarity we cannot impute to the Board a finding of knowing and deliberate deception that is not specifically reflected in its decision.

■ ■ ¶ 13. Nowhere in its report does the Board make an explicit finding regarding the chief's mental state or intent with respect to those inaccurate statements. We are invited instead to assume that such a finding was made in support of the Board's ultimate decision that it was legally entitled to fire the chief for cause. We decline to do so. First, under the Municipal Administrative Procedure Act, 24 V.S.A. § 1209, the Board's conclusions must "be based on the findings of fact." 24 V.S.A. § 1209(c). Furthermore, to the extent the Board seeks to enjoy the deference accorded to a quasi-judicial body, it must comply with the requirements imposed on other judicial organs. See *Harrington v. Dep't of Emp't Sec.*, 142 Vt. 340, 344, 455 A.2d 333, 337 (1982) ("We will consider the findings sufficient if they dispose of the issues presented and make a clear statement of the trier's decision and the basis upon which that decision was made." (quotation omitted)); see also *Sec'y, Vt. Agency of Natural Res. v. Irish*, 169 Vt. 407, 419, 738 A.2d 571, 580 (1999) ("The trial court has a fundamental duty to make all findings necessary to support its conclusions, resolve the issues before it, and provide an adequate basis for appellate review."). When reviewing a decision such as this, we must determine whether the evidence "reasonably tends to support [the] findings *and whether the findings in turn support the [body's] conclusions and decisions." Harrington*, 142 Vt. at 344, 455 A.2d at 336 (quotation omitted; emphasis added).

¶ 14. Here, a finding with respect to the chief's intent when he made the erroneous statements was not only an essential mental element of the misconduct charged; the chief's intent also presents the determinative factor in assessing whether the alleged conduct was sufficient to permit dismissal under our officer-tenure statute. Vermont law specifies that police officers, including a police chief, "shall hold office during good behavior, unless sooner removed for cause." 24 V.S.A. § 1931(a). The appointing authority may schedule a hearing to consider charges "[w]henever it appears to the appointing authority . . . that any regular officer has become negligent or derelict in the officer's official duty, or is guilty of conduct unbecoming an officer." 24 V.S.A. § 1932(a).

■ ¶ 15. The chief's failure to publicly disseminate information regarding a low-level sex offender could not, in and of itself,

constitute dereliction under 24 V.S.A. § 1932(a) because it does not implicate the performance of a specific duty. See Black's Law Dictionary 475 (8th ed. 2004) (defining dereliction in a similar context as "[w]illful or negligent failure to perform assigned duties; culpable inefficiency in performing assigned duties"). As we have observed, the Board premised its conclusion on the chief's misstatements and not on the actual failure to inform the community of the offender's residence, which he was apparently under no legal duty to do.

¶ 16. Nor would simple misstatements without intent to mislead constitute conduct unbecoming a law enforcement officer under 24 V.S.A. § 1932 in circumstances such as these, where the misstatements themselves — rather than negligent job performance — constitute the alleged cause for firing. We have had only limited occasion to consider the type of misconduct that constitutes conduct unbecoming an officer such that a municipal body may fire a police official for cause in harmony with 24 V.S.A. §§ 1931(a) and 1932(a). In *Martin v. Town of Springfield,* we sustained an officer's dismissal where the record upon which the town manager made his decision disclosed not only a specific refusal to follow direct orders but also a chronic unwillingness "to accept supervision." 141 Vt. 554, 559, 450 A.2d 1135, 1138 (1982); cf. *Kennedy v. Dep't of Pub. Safety,* 168 Vt. 601, 719 A.2d 405 (1998) (mem.) (state trooper dismissed for conduct unbecoming an officer and lying to investigators after driving under the influence in his cruiser and personal vehicle on multiple occasions did not establish a prima facie case of discrimination based on his alcoholism). These limited cases, as the Town correctly notes, do not signal a floor for the type of misconduct that would permit dismissal for cause; they simply illustrate the types of misconduct that has been considered sufficient in the past.

¶ 17. A wide range of behavior — public or private — may qualify as conduct unbecoming an officer of the law. See, e.g., *Andras v. Wyalusing Borough,* 796 A.2d 1047, 1048-50 (Pa. Commw. Ct. 2002) (funds mismanagement, failure to maintain records, lengthy disciplinary history sufficient for police chief's removal); *Borough of Riegelsville v. Miller,* 639 A.2d 1258, 1263 (Pa. Commw. Ct. 1994) (police chief's adultery was conduct unbecoming an officer even though the affair took place in private life). Generally speaking, we require higher standards of conduct

from our law-enforcement officials than we might of people in other professions. *Cerceo v. Borough of Darby*, 281 A.2d 251, 255 (Pa. Commw. Ct. 1971) ("Twentieth Century America has the right to demand for itself, and the obligation to secure for its citizens, law enforcement personnel whose conduct is above and beyond reproach. The police officer is expected to conduct himself lawfully and properly to bring honor and respect to the law which he is sworn and duty-bound to uphold.").

¶ 18. On the question of the type of conduct that would qualify as conduct unbecoming an officer and thereby justify dismissal for cause, New Hampshire law, which enshrines employment protections for police officials similar to those found in our statutes, is instructive. Compare 24 V.S.A. § 1931(a) (permanent officers "shall hold office during good behavior, unless sooner removed for cause"), with 105 N.H. Rev. Stat. Ann. § 2-a. (police chief "subject to suspension without pay or dismissal *only for cause*" (emphasis added)). That state's courts have concluded that cause for removal under their governing statute must be substantial, in part, to advance the sound public policy of avoiding dismissals animated by "personal dislike, political disagreement, or reasons of that nature." *Perron v. City of Somersworth*, 553 A.2d 283, 285 (N.H. 1988) (quotation omitted). The New Hampshire Supreme Court has specifically rejected a rote formulation of "substantial cause." See *id.* (stating that "the very breadth of a chief's responsibilities precludes any simple, pat definition of 'substantial cause'"). Rather, the New Hampshire courts' inquiry has been guided by reference to several, interrelated considerations. Among those considerations is the obvious requirement that the complained-of misdeeds must have a direct bearing on law enforcement officers' ability to carry out their jobs. "[C]ause for removal under the statute must be substantial and *requires a demonstration of unfitness or incapacity to discharge the responsibilities of the position.*" *Yoder v. Town of Middleton*, 876 A.2d at 218 (emphasis added) (citing *Perron*, 553 A.2d at 285). "[A] ground for dismissal must be one which specifically relates to and affects the administration of the office, and must be restricted to something directly affecting the rights and interests of the public." *Perron*, 553 A.2d at 285 (quotation and alteration omitted). Finally, the New Hampshire courts have concluded under their similar statute that "the ground for removal must be of substantial significance, such as corruption or inefficiency in office, infraction of the rules

governing the police force, the commission of an infamous crime, or the conviction of a misdemeanor and sentence to imprisonment for a term." *Id.* (quotation omitted).

¶ 19. We have no difficulty agreeing with the Town's reasonable argument that lying and a reputation for dishonesty would compromise a police chief's ability to carry out his official duties. Compare *Jones v. Kansas State Univ.*, 106 P.3d 10, 28 (Kan. 2005) (officer's intentional submission of false report and destruction of evidence unnecessarily exposed police department to charges of misconduct and "seriously affected his credibility and integrity as a[n] officer"), with *City of N. Vernon v. Brading*, 479 N.E.2d 619, 624-25 (Ind. Ct. App. 1985) (officer's issuance of insufficient-funds check "without accompanying [supported] findings of criminal intent is not such conduct which 'renders the continuance of the officer in his office detrimental to the discipline or efficiency of the service' — and thus is not conduct unbecoming an officer."). A reputation for dishonesty also would diminish public respect in a way that would bear on departmental morale. See *In re Zeber*, 156 A.2d at 825 ("Unbecoming conduct on the part of a municipal employee, especially a policeman or fireman, is any conduct which adversely affects the morale or efficiency of the bureau to which he is assigned. . . . Unbecoming conduct is also any conduct which has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services."). Here, however, we do not have a specific finding that the chief knowingly and deliberately lied or that his actions provoked — or would provoke — those types of consequences. See *Clites v. Twp. of Upper Yoder*, 485 A.2d 724, 728 (Pa. 1984) (record did not support charge of conduct unbecoming an officer stemming from police chief's destruction of log books that arguably served no purpose where there "was no evidence . . . to indicate that the morale or efficiency of the police department had suffered as a result . . . nor was there evidence that . . . conduct had destroyed public respect for or confidence in the police department"). Rather, we have a finding that may be interpreted in one of many ways.

¶ 20. Because the Board's findings or lack thereof with respect to the allegation that the chief *knowingly and deliberately* misled the public are ambiguous, we conclude that they cannot

support the Board's determination to fire the chief for conduct unbecoming an officer under· our officer-tenure statute.

*Affirmed.*