******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PALMER, J., with whom ESPINOSA, J., joins, dissenting. The majority acknowledges, as it must, that there is a well-defined and dominant public policy against intentional dishonesty by police officers in connection with their employment. The majority nevertheless concludes, contrary to the unanimous opinion of the Appellate Court, that the arbitration award reinstating Justin Loschiavo as a police officer with the plaintiff, the town of Stratford (town), despite his concededly intentional and serious lies made in the course of his employment, did not violate public policy. Because I believe that the majority's conclusion seriously undermines the strong public interest in ensuring that the law enforcement officers of this state conduct themselves with honesty and integrity, I respectfully dissent.

The relevant facts are undisputed and straightforward. Loschiavo was hired by the town as a probationary police officer in 2006. At the time, he had a history of epilepsy but his condition was controlled by medication. On June 6, 2009, as a result of an epileptic seizure, Loschiavo lost control of his police cruiser and struck two parked cars. Loschiavo was ordered not to drive for six months by his personal physician, Philip Micalizzi. Micalizzi then cleared Loschiavo for light duty work, to commence on August 17, 2009, subject to the condition that he not engage in any activity that might cause severe injury if he were to lose consciousness. On December 29, 2009, Micalizzi returned Loschiavo to full duty status without restriction. Micalizzi also indicated, however, that he could not guarantee that Loschiavo would not have another seizure, and that the town would have to determine what restrictions, if any, to place on Loschiavo in connection with the performance of his official duties.

Thereafter, the town referred Loschiavo to a neurologist, Samuel L. Bridgers, for an independent medical examination to determine whether Loschiavo could safely return to work and, if so, under what conditions. After examining Loschiavo and reviewing his medical history, Bridgers submitted a report to the town's human resources director, Ronald Ing, in which Bridgers expressed the opinion that Loschiavo was capable of returning to work as a full-time police officer subject only to the restriction that he be allowed to call in sick whenever he felt the warning signs of an impending seizure. Bridgers also stated, however, that there were no guarantees that Loschiavo would not suffer seizures in the future.

In the course of reviewing Bridger's report, Ing noticed several discrepancies between the medical records provided by Micalizzi and the medical history

that Loschiavo had provided to Bridgers. In light of these inconsistencies, it was apparent to Ing that Loschiavo did not disclose to Bridgers, first, that he had experienced two other seizures since 2004, and, second, that he had used or abused alcohol, which may well have precipitated those seizures. In this regard, it also was apparent to Ing that Loschiavo had removed certain notes from Micalizzi's medical file before Loschiavo turned that file over to Bridgers. Ing therefore provided Bridgers with a complete set of the medical records from Micalizzi's file detailing Loschiavo's history.

After reviewing those records, Bridgers reexamined Loschiavo and reported his findings. Bridgers observed that Loschiavo had acknowledged to Micalizzi for the first time in June, 2009, that he had a problem with alcohol and that his seizures were related to his alcohol abuse. Loschiavo also told Micalizzi that he was enrolled in an alcohol treatment program. In light of these revelations, Bridgers indicated that he did not know whether Loschiavo could be "trusted to avoid activities" that would increase his likelihood of suffering seizures, in particular, his use or abuse of alcohol. Although expressing the view that people with epilepsy probably should not be employed as police officers, Bridgers stated that Loschiavo likely posed no greater risk at that time than he did when he was hired in 2006.

The town charged Loschiavo with lying during the independent medical examination in violation of police department policy concerning integrity, conduct unbecoming an officer, and attention to duty.[1] Shortly thereafter, the town held a hearing to afford Loschiavo the opportunity to respond to that charge. At the conclusion of the hearing, the hearing officer found that Loschiavo had violated police department policy by lying in connection with the independent medical examination, and he recommended Loschiavo's termination. Loschiavo's employment was terminated that same day.

Following his termination, and in accordance with the collective bargaining agreement between the town and the defendant union, American Federation of State, County and Municipal Employees, Council 15, Local 407 (union), the union filed a grievance on Loschiavo's behalf claiming that his termination was without just cause and in violation of the parties' agreement. The matter was referred to an arbitration panel which, following a hearing, issued a written decision that states in relevant part as follows: "The first thing that we note is that the violation that [Loschiavo] was accused of committing is a very serious one for a police officer who is charged with upholding the law. The public does expect that the conduct of their law enforcement officials be above that of their neighbors and fellow citizens. A police officer's lying about his physical and mental condition to doctors that could return (or pre-

vent) him/her to work is understandable because he/she wants his/her job back. However, it is very dangerous for the citizens and public at large should that police officer suffer a seizure that could cause injury or death to the officer and/or to the citizens of that community.

"We also note, however, that once [Loschiavo's] true conditions were known and considered by both doctors Micalizzi and Bridgers, they returned [Loschiavo] to his full duties without restrictions. The only reservation was that of . . . Bridgers, who felt that [Loschiavo] should be allowed to call out sick if he felt a seizure coming on when waking up. He stated that [Loschiavo] knew the signs of an upcoming seizure and could predict it and should be allowed to call out sick when [he] felt the signs coming on.

"We further note that the [t]own knowingly hired [Loschiavo] recognizing his potential limitations, regarding his epileptic seizures, and that he completed his probationary period and went on to perform well until the seizure of June 6, 2009. There was no evidence presented by the [t]own about his job performance and so we infer that his job performance was at least satisfactory. We therefore find that the termination of [Loschiavo] was excessive and so we hereby order that he be returned to work, without [back pay] but with no loss to seniority. . . . [In addition] the [t]own is well within its rights to have [Loschiavo] examined by a medical doctor, from time to time, to make sure that his condition is stable and that he is not using alcohol. Accordingly, based on the above, the unanimous [p]anel sustains the grievance." The panel's award imposed a total effective sanction on Loschiavo for his misconduct of nine months suspension, without pay.

The town filed an application to vacate the arbitration award with the Superior Court claiming, inter alia, that the award violated the clearly defined and important public policy against intentional dishonesty by officers in the course of their employment. The court rendered judgment denying the town's application, concluding that the award suspending Loschiavo without pay for nine months and returning him to active duty did not contravene that policy.[2] The town appealed from the judgment of the trial court to the Appellate Court, renewing the public policy claim that it had raised in the trial court. The Appellate Court agreed with the town, reversed the judgment of the trial court and remanded the case to that court with direction to grant the town's application to vacate the arbitration award. *Stratford* v. *AFSCME, Council 15, Local 407*, 140 Conn. App. 587, 597, 60 A.3d 288 (2013). This court granted the union's petition for certification, limited to the issue of whether the Appellate Court correctly concluded that the panel's award must be vacated as violative of public policy.

As the majority has explained, our review of the

unrestricted arbitral submission in the present case is limited: the award of the panel is entitled to deference, and therefore must be sustained, unless enforcing the award would be contrary to public policy. E.g., *State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 526–27, 69 A.3d 927 (2013). This narrow exception to the finality of an arbitration award "is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract . . . ." (Internal quotation marks omitted.) *State* v. *New England Health Care Employees Union*, 271 Conn. 127, 135, 855 A.2d 964 (2004). In making that determination, we employ a two step analysis: we first must decide whether the award implicates an explicit, well-defined and dominant public policy and, if it does, we also must decide whether the award itself violates that public policy. *State* v. *AFSCME, Council 4, Local 391*, supra, 529. The question, then, is not whether the underlying improper conduct—here, Loschiavo's intentional dishonesty in connection with the independent medical examination—violates public policy, which it most certainly does. Nor are we concerned with the correctness of the award under the collective bargaining agreement. See id., 532–33. We must determine, rather, whether the panel's award suspending Loschiavo for nine months without pay violates the public policy against intentional dishonesty by a police officer because only termination of employment is adequate to vindicate that policy. Id., 531. Finally, although we give appropriate deference to the factual findings of the panel, we exercise plenary review over the purely legal question of whether, in light of those facts, the arbitration award must yield to overriding public policy considerations. Id., 528.

It is inarguable, as the majority states, that there is a "common public interest in the integrity and trustworthiness of local police forces. The public expects police officers to be credible and honest in their law enforcement duties." (Footnote omitted.) Consequently, as the majority also recognizes, "there is a public policy against the employment of law enforcement personnel who have engaged in intentional dishonesty that directly pertains to their qualification and ability to perform official duties." I fully agree with this unremarkable proposition.

We therefore must consider the second part of the test, namely, whether the award reinstating Loschiavo, following an unpaid suspension of nine months, violates this policy. For the reasons set forth subsequently in this dissenting opinion, and in contrast to the majority, I agree with the Appellate Court that it does violate public policy because, in the present case, nothing short of termination is sufficient to vindicate the public's overriding interest in ensuring that police officers con-

duct themselves with honesty and integrity in matters relating to their employment.[3]

The role of the police in our society is a unique one due to the broad authority and enormous discretion vested in them by the public. The very nature of their work, which includes the power to detain, search, and arrest, demands that they be granted such authority and discretion, for without it, they could not be expected to discharge their duty as guardians of the safety and security of the community. With that great power, however, comes the responsibility to act in a manner that is faithful to the great trust placed in them by the community. "[A police officer] is directly, immediately, and entirely responsible to the city or [s]tate which is his employer. He owes his entire loyalty to it. . . . He is a trustee of the public interest, bearing the burden of great and total responsibility to his public employer." *Gardner* v. *Broderick*, 392 U.S. 273, 277–78, 88 S. Ct. 1913, 20 L. Ed. 2d 1082 (1968). As this court has recognized, because of the distinctive character of that special public trust, the "qualities of truthfulness, honesty and integrity . . . are particularly essential" for a police officer. (Citation omitted.) *Wilber* v. *Walsh*, 147 Conn. 317, 320, 160 A.2d 755 (1960). Indeed, "[f]ew institutions depend as heavily on integrity and credibility for the effective performance of their duties as do police departments." *Local 346, International Brotherhood of Police Officers* v. *Labor Relations Commission*, 391 Mass. 429, 439, 462 N.E.2d 96 (1984).

For these reasons, and because, as the police department rules aptly recognize, police officers are routinely called upon to perform their duties without close or immediate supervision; see footnote 1 of this dissenting opinion; we hold them to the highest standard of integrity and trustworthiness, higher even than other public employees.[4] "[T]here are certain forms of employment which carry a position of trust so peculiar to the office and so beyond that imposed by all public service that conduct consistent with this special trust is an obligation of the employment. . . . Police officers fall into such a category; in order to perform their jobs, they voluntarily undertake to adhere to a higher standard of conduct than that imposed on ordinary citizens, must comport themselves in accordance with the laws that they are sworn to enforce *and* behave in a manner that brings honor and respect for rather than public distrust of law enforcement personnel." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Springfield* v. *Civil Service Commission*, 469 Mass. 370, 379, 14 N.E.3d 241 (2014). As former Chief Justice Margaret H. Marshall of the Supreme Judicial Court of Massachusetts has noted, "[t]here is a difference in kind, well recognized in our jurisprudence, between police officers, who have the authority to command citizens, take them into custody, and to use physical force against them, and other public officials who do

not possess such awesome powers. We hold police officers to a higher standard of conduct than other public employees . . . fully confident that, in most cases, they will meet that standard . . . . [But it] is the recognition of the potential for abuse of power that has caused our society, and law enforcement leadership, to insist that citizens have the right to demand the most of those who hold such awesome powers." (Citations omitted; footnote omitted.) *Commonwealth* v. *Hyde*, 434 Mass. 594, 613, 750 N.E.2d 963 (2001) (Marshall, C. J., dissenting). It is abundantly clear that the honesty and integrity of those officers is essential to our system of justice; e.g., *International Brotherhood of Police Officers* v. *Windsor*, 40 Conn. Supp. 145, 148, 483 A.2d 626 (1984); because "the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them." (Internal quotation marks omitted.) *Pasadena Police Officers Assn.* v. *Pasadena*, 51 Cal. 3d 564, 572, 797 P.2d 608, 273 Cal. Rptr. 584 (1990).

In the present case, the arbitration panel itself characterized Loschiavo's intentional lies about his "physical and mental condition" as "very serious . . . for a police officer who is charged with upholding the law." The panel further acknowledged that those lies were potentially "very dangerous" because they were calculated to deceive the town about the true nature and extent of his seizure disorder and alcohol use or abuse. In so doing, the panel explained, Loschiavo created a grave risk of an accident or event "that could cause injury or death to [Loschiavo] and/or to the citizens of [his] community." The seriousness of Loschiavo's lies from the perspective of the panel itself is reflected in the fact that the panel imposed a sanction on Loschiavo of a nine month suspension from duty without pay.

As an official in whom the community has placed vast discretion and great trust and confidence, the public was entitled to expect that Loschiavo, like his fellow officers, would consistently demonstrate a high level of trustworthiness and personal integrity when acting in his capacity as an officer. Loschiavo's violation of that trust and confidence, by lying in connection with the independent medical examination, was indeed "very serious," as the panel observed, because those lies bore directly on his ability to return to work and to safely perform his duties as a police officer. Short of a violation of the criminal law, it is hard to conceive of misconduct by a police officer that is more serious. Simply stated, when Loschiavo placed his own perceived self-interest over the safety of the community by lying about his fitness to serve, he demonstrated that he is not fit to serve. As this court has stated in a related context, the panel, in reinstating Loschiavo, "minimize[d] society's overriding interest in preventing conduct such as that at issue in this case from occurring"; (internal quotation

marks omitted) *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 477, 747 A.2d 480 (2000); and sent a message that that conduct can be tolerated. Id.

The majority offers several reasons to support its conclusion that the award in the present case did not violate the clear and dominant public policy against intentional dishonesty by police officers in connection with their employment. These reasons are: Loschiavo did not lie under oath; his dishonesty was not "disruptive or repeated"; he was not dishonest "before his fellow police officers or while performing his official duties"; he had not previously been "warned about the repercussions of his misconduct so he was not incorrigible"; the punishment he received was "severe"; and his "conduct, although serious, did not compromise his qualifications or ability to perform his official duties as a police officer" because both Micalizzi and Bridgers cleared him to return to duty. I disagree that any one or more of these considerations justify a sanction less severe than termination.

First, the fact that Loschiavo did not lie under oath detracts little from the seriousness of his lies because his dishonesty is directly related to his ability to safely perform the duties of a police officer. Of course, if Loschiavo *had* lied under oath that alone would be sufficient cause to vacate an award reinstating him to service because perjury by a police officer requires termination under any standard. Merely because Loschiavo's lies were not perjurious, however, says little or nothing about whether he should be permitted to return to his duties. Rather, the nature and gravity of those lies is the paramount consideration in determining whether termination is warranted, and, as the majority concedes, the lies were extremely serious. In fact, his misconduct included withholding or altering medical reports that documented his seizure history and his history of alcohol use or abuse, conduct that is tantamount to tampering with evidence and obstruction of justice.

With respect to the majority's assertion that the lies were not repeated, it is true that Loschiavo's dishonesty related to but one event, his examination by Bridgers. But just as one act of perjury by a police officer would be grounds for termination, so, too, can lies like those in the present case support that ultimate sanction. Consequently, the number of times Loschiavo lied is far less important than the severity of his lies. This is not a case, moreover, in which Loschiavo, after lying to Bridgers, decided to tell the truth before getting caught; only because of Ing's attention to detail was he able to discern that Loschiavo had lied about his seizure history and alcohol use and abuse. Although I am not entirely clear as to what the majority means when it states that Loschiavo's lies were not "disruptive," his lies resulted in an investigation into Loschiavo's conduct pertaining

to the independent medical examination; a second examination of Loschiavo by Bridgers; a second report by Bridgers; a hearing before a hearing officer followed by Loschiavo's termination by the town; a grievance by the union challenging that action by the town; a hearing before the arbitration panel; an application filed with the Superior Court to vacate the panel's award; an appeal to the Appellate Court; and now this certified appeal. In addition, as I explain more fully hereinafter, Loschiavo's misconduct will require the state to disclose his lies and his nine month suspension without pay in any criminal case in which he serves as a witness in his capacity as a police officer, and he will be subject to cross-examination about his dishonesty. Loschiavo's lies were disruptive by any measure.

The fact that he was "not dishonest before his fellow police officers" means nothing with respect to the seriousness of his misconduct. There is no doubt that every officer in his department is well aware of Loschiavo's misconduct. More importantly, the fact that that misconduct occurred outside the presence of other officers is irrelevant to the public policy analysis. If it were relevant, an officer who lied about an event that only he witnessed—a circumstance that would make it more difficult to establish that the officer was lying—would be entitled to leniency because he was "not dishonest before his fellow police officers . . . ." Such an absurd result cannot be countenanced.

With respect to the majority's assertion that Loschiavo did not lie while performing his official duties, I do not share the majority's cramped view of a police officer's duties. When, as here, a police officer undergoes an examination conducted for the purpose of ascertaining his fitness to serve, his obligation to cooperate with that examination is no less a responsibility than directing traffic or completing a report.

The majority also places weight on the fact that Loschiavo had not been "warned about the repercussions of his misconduct so he was not incorrigible . . . ." Implicit in this argument is the suggestion that Loschiavo could not have been expected to know that what he did was wrong, and that such conduct might well carry a severe sanction. I am unwilling to accept this premise: no law enforcement officer could have any doubt as to the seriousness and potential repercussions of lying in connection with an independent medical examination about highly material matters directly related to his or her fitness. Of course, only time will tell if Loschiavo is an "incorrigible" liar. But in view of the seriousness of the lies for which he was caught, I see no reason why the town should have to wait and see if Loschiavo is an inveterate or habitual liar; it is enough that he has demonstrated a willingness to lie about an exceedingly important job related matter when he believed that it served his purpose to do so. Wholly

aside from whether he will repeat this conduct in the future, his credibility has been compromised irretrievably.

Although it is true, as the majority also asserts, that the sanction Loschiavo received from the arbitration panel was severe, the severity of the sanction only underscores the seriousness of his lies. More to the point, however, the question is not whether the sanction imposed by the panel is severe; the question, rather, is whether the sanction is adequate to vindicate the public's overriding interest in maintaining an honest and trustworthy police department.

The majority's remaining assertion—that termination is not necessary because Loschiavo's conduct does not undermine his ability to perform his duties as a police officer because he ultimately was cleared for work despite his dishonesty—is completely off the mark in view of the fact that Loschiavo will be subject to impeachment for his dishonesty whenever he testifies. "The law in Connecticut on impeaching a witness' credibility provides that a witness may be cross-examined about specific acts of misconduct that relate to his or her veracity. See Conn. Code Evid. § 6-6 (b) (1) ('[a] witness may be asked, in good faith, about specific instances of conduct of the witness, if probative of the witness' character for untruthfulness') . . . ." (Citations omitted.) *State* v. *Annulli*, 309 Conn. 482, 492, 71 A.3d 530 (2013); see also *State* v. *Chance*, 236 Conn. 31, 60, 671 A.2d 323 (1996) (right of cross-examination generally includes right to question witness about prior false statements). Indeed, under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny, in a criminal case, principles of due process require the state to provide the defendant with evidence of which it is or should be aware that is favorable to the defendant and material either to guilt or to punishment. "The United States Supreme Court also has recognized that '[t]he jury's estimate of the truthfulness and reliability of a . . . witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.' *Napue* v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). Accordingly, the *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence; e.g., *United States* v. *Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Giglio* v. *United States*, 405 U.S. 150, 154–55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); which, broadly defined, is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.' . . . *United States* v. *Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)." *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 369–70, 71 A.3d 512 (2013).

The majority essentially ignores these principles even

though they are highly relevant to the present case. It is undisputed both that Loschiavo's lies were very serious because they related directly to his mental and physical fitness to serve as a police officer, and that the severity of the sanctions imposed on him for his misconduct, first by the town and then by the arbitration panel, reflect the gravity of that misconduct. It also is inarguable that testifying in court and attesting to affidavits in support of search and arrest warrants are among the most important duties of a police officer. Given the nature of Loschiavo's lies, whenever he testifies, the state will be required to make the defendant aware of his dishonesty, and defense counsel will be able to impeach Loschiavo with his deceitful conduct. No doubt there will be criminal prosecutions in which Loschiavo's credibility is critical to the state's case, and in those cases especially, the ability of defense counsel to successfully attack his veracity by use of his lies may well make a difference in the outcome of the case.[5] In forcing the town to reinstate Loschiavo despite this fact, the majority achieves a result that neither the state nor the people it represents should be required to tolerate.[6]

In sum, the town had no choice but to terminate Loschiavo's employment as a police officer because his intentional and serious dishonesty has grievously compromised his credibility and integrity, and he has been rendered unfit to serve as a sworn officer. His reinstatement as a member of the police department following his attempt to deceive the town about his fitness to serve is incompatible both with the department's need to ensure that its officers "are of the highest moral and ethical character possible"; *O'Hartigan* v. *Dept. of Personnel*, 118 Wn. 2d 111, 124, 821 P.2d 44 (1991); and with the town's "right to demand for itself, and the obligation to secure for its citizens, law enforcement personnel whose conduct is above and beyond reproach." (Internal quotation marks omitted.) *Turnley* v. *Vernon*, 194 Vt. 42, 51, 71 A.3d 1246 (2013). The result dictated by the majority not only subverts these weighty interests, it devalues the role of the police in our society. Indeed, in failing to recognize that intentional and serious dishonesty by the police is so detrimental to the community and so damaging to our justice system that it requires the strongest possible response, the majority disserves both the police and the public. Because the town should not be forced to retain an officer whose dishonesty and lack of integrity make it impossible for him to discharge his duties effectively and with the confidence of the public, I respectfully dissent.

[1] These provisions of police department policy as set forth in the arbitration award provide in relevant part: "Integrity

"The public demands that the integrity of its law enforcement officers be above reproach. . . . An officer must avoid any conduct which might compromise the integrity of the [d]epartment or fellow officers, or him/herself.

"Conduct Unbecoming an Officer

"A police officer is the most conspicuous representative of government.

To the majority of people, police officers are a symbol of stability and authority upon which they can rely. . . . The conduct of a police officer has possible ramifications, which may reflect on the [d]epartment. . . . [E]mployees must avoid conduct, which might impair the reputation or efficiency of the [d]epartment.

"Attention to Duty

"As most police work is performed without close supervision, responsibility for proper performance of duty lies with the officer. . . . An officer has the responsibility for the safety of the community . . . and discharges that responsibility by faithful and diligent performance of duty. Anything less violates the trust placed in him/her by the people. . . ."

[2] In its memorandum of decision, the trial court observed that the union had conceded that Loschiavo lied to Bridgers with respect to his prior seizures and alcohol use or abuse. The union also acknowledged that Loschiavo's conduct in doing so violated police department policy.

[3] The majority states that in reaching this conclusion, I have failed to take into account the policy favoring arbitration as a means of dispute resolution. See, e.g., *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 526. On the contrary, I am fully cognizant of that policy, which is reflected in the deference that we ordinarily give arbitration awards. As the majority acknowledges, however, this deference must give way when such an award violates a dominant and well established public policy. This is such a case.

[4] See, e.g., *One Three Five, Inc.* v. *Pittsburgh*, 951 F. Supp. 2d 788, 814 (W.D. Pa. 2013) ("Because police are vital to protecting the public's safety and are granted the power to make arrests and use necessary force to carry out that duty, they must be held to a higher standard of conduct than other [municipal] employees . . . . [P]olice officers are held to a higher standard of conduct than other citizens, including other public employees." [Citation omitted; internal quotation marks omitted.]); *In re Phillips*, 117 N.J. 567, 576–77, 569 A.2d 807 (1990) ("The obligation to act in a responsible manner is especially compelling in a case involving a law enforcement official: [A] police officer is a special kind of public employee. His primary duty is to enforce and uphold the law. He carries a service revolver on his person and is constantly called upon to exercise tact, restraint and good judgment in his relationship with the public. He represents law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public . . . . Nor can a police officer complain that he or she is being held to an unfairly high standard of conduct. Rather, it is one of the obligations he undertakes upon voluntary entry into the public service." [Citation omitted; internal quotation marks omitted.]).

[5] Although acknowledging that Loschiavo will be subject to impeachment for his lies whenever he testifies, the majority simply does not address this problem, asserting only that I have "overstat[ed] the ramifications that might occur should Loschiavo be called to testify." See footnote 4 of the majority opinion. I am unable to discern why the majority believes that I have overstated this concern because the majority has elected not to provide an explanation.

I also note that the majority states that "the record does not reflect whether Loschiavo's reinstatement as a police officer could include responsibilities other than those in which he would be expected to testify as a witness . . . ." See footnote 4 of the majority opinion. I am unsure what point the majority seeks to make in speculating about what the record does not reflect. If, however, the majority is merely suggesting that some of Loschiavo's responsibilities as a police officer will not require him to testify, I fully agree. The problem, however, is that Loschiavo's duties as a sworn law enforcement officer *will* require that he be available to serve as a witness on a regular basis.

[6] The union argues that "mandating termination of every police officer who has been dishonest, regardless of degree or circumstance, would result in the unnecessary terminations of some police officers, placing the public safety in jeopardy, and running up huge costs to taxpayers." Of course, I do not suggest that a police officer must be terminated any time that he is found to have been untruthful in the course of his employment. Although dishonesty by a police officer is never to be condoned, some lies may be so minor or inconsequential that loss of employment simply is not necessary to vindicate the public policy against police dishonesty. For example, in *State* v. *Public Safety Employees Assn.*, 257 P.3d 151, 152–53 (Alaska 2011), the Alaska Supreme Court concluded that an arbitral award reinstating a state trooper did not violate public policy even though the trooper had lied about a minor matter involving the inappropriate way in which he had

operated a motorcycle during a motorcycle certification program conducted out of state. When asked if he knew who in the program had engaged in such horseplay while operating a motorcycle, the trooper initially denied having any such knowledge, but later admitted that he himself was the individual involved. Id., 153. Although the trooper initially was permitted to return to work, he subsequently was terminated for his conduct in that matter and for other complaints of misconduct, but an arbitrator ordered that he be reinstated; id., 153–54; and the Alaska Supreme Court ultimately affirmed that award. Id., 166. In so doing, the court observed that the trooper had engaged in "minor acts of dishonesty . . . not directly related to [his duty] to the public"; id., 162; and emphasized that its decision would have been different if the trooper's conduct had been more culpable. Id. Of course, the serious lies that are the subject of the present case bear no resemblance to the lie, subsequently self-corrected, made by the trooper in *Public Safety Employees Assn.*

The union also contends that only lies by a police officer that rise to the level of a crime, in particular, tampering with or fabricating physical evidence in violation of General Statutes § 53a-155, perjury in violation of General Statutes § 53a-156, and false statement in the second degree in violation of General Statutes § 53a-157b, are sufficiently serious to justify reversing an arbitration award reinstating the officer following his or her termination from employment. This view is far too solicitous of dishonesty by the police. There simply is no reason why a police officer's lies or dishonest conduct must be criminal to warrant the conclusion that reinstatement would violate the strong public policy against police dishonesty, and I do not read the majority opinion as endorsing the position advocated by the union.

————————————————